INFORMATION LEASING CORPORATION, Appellant and Cross–Appellee,

v.

CHAMBERS, d.b.a. Maplewood Inn, Appellee and Cross–Appellant.*

[Cite as Info. Leasing Corp. v. Chambers, 152 Ohio App.3d 715, 2003-Ohio-2670.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–020436 and C–020461.

Decided May 23, 2003.

---

* Reporter's Note: The court sua sponte removed this case from the accelerated calendar.

716

718

Coley & Associates and William P. Coley II, for appellant and cross-appellee.

Thomas R. McGuire, for appellee and cross-appellant.

Mark P. Painter, Judge.

{¶ 1} This case involves an owner of a small restaurant, a bankrupt vendor of automated teller machines ("ATMs"), a leasing company that bought an ATM and leased it to the restaurant owner, and an unusual application of the Uniform Commercial Code (UCC).

{¶ 2} The lessor is appellant/cross-appellee Information Leasing Corporation, ("ILC") a subsidiary of Provident Bank; the restaurant owner is appellee/cross-appellant Cathy L. Chambers, d.b.a. Maplewood Inn ("Chambers"), and the vendor is JRA 222, Inc., d/b/a Credit Card Center ("CCC").

{¶ 3} This case (and dozens more) arose from the ashes of CCC's bankruptcy. CCC's sales representative had guaranteed Chambers certain revenues if she placed a leased ATM in her restaurant and allowed CCC to service it. When CCC failed to pay Chambers the guaranteed revenues, Chambers stopped making payments to ILC under the lease. ILC sued Chambers under the lease's acceleration clause for rents past due and all future rents.

{¶ 4} We are asked to answer six questions. The two most important are (1) whether ILC had an obligation to "mitigate" its damages by repossessing and selling or renting the ATM once Chambers informed it that she no longer wanted the machine, and (2) whether CCC's sales representative was an agent of ILC under the doctrine of apparent agency. We answer the first question with an emphatic *yes*. *No* is the answer to the second question.

## I. CCC's Dealings with Chambers

{¶ 5} Paul McCarthy, one of CCC's employees, approached Chambers and offered her the opportunity of installing an ATM machine in her restaurant. McCarthy guaranteed a monthly income of $200 and advertising revenue of $55. He also promised her 85 percent of the swipe fee charged to the users of the ATM. Induced by these promises, Chambers agreed to place the ATM at her business. She also admitted that she leased the ATM to make it more convenient for her customers to pay their bills.

{¶ 6} ILC was aware that CCC's employees were making these promises. The materials provided to Chambers demonstrated that ILC did not specifically inform her that ILC was not bound by CCC's guaranteed-revenue promises. And ILC admitted that it did not make such a guarantee in the documents it provided to Chambers because its competitors did not do so. (But ILC and CCC had been negotiating an operating agreement since the beginning of 2000, which was executed in July 2000, two months after Chambers signed the lease. In that agreement, CCC agreed to verbally confirm with the lessee several items prior to each lease transaction, including the fact that CCC and ILC were neither the

same companies nor agents of each other, and that the lessee's obligations under the lease were not predicated on either revenue levels or the lessee's receipt of payment from CCC. According to the operating agreement, CCC also agreed to provide ILC with evidence of compliance with each verbal confirmation.)

{¶ 7} McCarthy supplied Chambers with a lease application designated at the top "Credit Card Center Lease Application." Nowhere did the document indicate a specific leasing company. The application identified CCC as the vendor. Chambers signed the application on March 31, 2000. That same day, a "Credit Card Center Merchant Processing Agreement" was "made" between CCC and Chambers. That document indicated that Chambers would receive 85 percent of each customer's swipe fees. The document also made reference to the ATM lease and ownership and stated that if Chambers changed the processing of the ATM terminal during the lease, the "lease company m[ight] call the lease due." The document named no specific leasing company. (Chambers claimed not to have signed this document until April 18, 2000.) This same document also allowed CCC to retain any money it owed Chambers to cover any delinquent lease payments owed directly to the "lessor of the ATM."

{¶ 8} CCC forwarded the lease application to ILC. Upon approval by ILC, ILC prepared a lease and returned it to CCC to forward to Chambers for her signature.

{¶ 9} On April 18, Chambers signed an ATM Advertising Agreement and a Merchant Information form, both containing CCC's name and addresses. Neither mentioned ILC. The second document contained an equipment and fee schedule that contained the amount of the monthly lease payments and the requirement that Chambers pay the first and last months' rent with the application, with a check made payable to CCC. She also signed a Merchant Processing Bonus form on CCC letterhead that guaranteed a minimum processing revenue. To qualify, Chambers had to do three things, including maintaining her lease payments or purchase arrangements. The document did not refer to ILC.

{¶ 10} McCarthy also obtained Chambers's signature on ILC's lease, ILC's lease confirmation form, ILC's certificate of acceptance, and ILC's form concerning insurance on the ATM. Chambers testified that, except for the credit application, all other documents presented by McCarthy were signed on April 18, 2000.

{¶ 11} Since approximately February 2000, ILC was aware that the Merchant Processing Agreement, the ATM Advertising Agreement, the Merchant Processing Bonus, and its lease agreement were being used by CCC to "sign up [CCC's] customers."

{¶ 12} George Paris, ILC's vice-president of collections and recovery, testified that ILC had no authority to control CCC's conduct in the field. According to Paris, it was standard practice "with other mid-market lessors within the equipment leasing industry" to have a vendor obtain a credit application from a potential lessee and to obtain the lessee's signature on the lease when the credit application had been approved.

{¶ 13} According to Chambers, McCarthy did not tell her to whom the credit application would be sent. McCarthy represented himself as "a sales agent for the ATM," and Chambers believed that CCC and ILC were the same company. Chambers was not aware that she could have purchased the ATM instead of leasing it.

{¶ 14} The ATM was installed. ILC then purchased the ATM from CCC and leased it to Chambers.

## II. The Lease

{¶ 15} The lease between ILC and Chambers was a one-page, ten-paragraph document. The top of the left side of the lease contained ILC's name and address in bold type. A paragraph on the top right side of the lease explained that the lease was written in "plain language" and that it had legal and financial consequences. The paragraph invited the potential lessee to telephone "the leasing company" before signing the document, and it provided a telephone number for the lessee to call for answers to any questions. The lease identified CCC as the vendor of the ATM and Chambers as the lessee.

{¶ 16} The term of the lease was for 60 months and required monthly payments of $259. At the signing of the lease, the lessee was to pay certain amounts, including the first and last months' rent. (For bookkeeping convenience, CCC's employee collected and retained Chambers's first and last months' rent, which was credited to Chambers's account and used to reduce the total amount owed by ILC to CCC for the ATM. On the date she executed the lease, Chambers wrote a check to CCC for the first and last months' rent.)

{¶ 17} The second paragraph of the lease stated in bold type that the lessee could not cancel the lease for any reason. It also stated that the lessee, not the lessor, had accepted the equipment and the vendor; that the lessor was not responsible for equipment failure or the vendor's acts; that the equipment was being leased "as is," and that the lessor disclaimed all express and implied warranties. The lessor assigned to the lessee any warranties it had received from the vendor and informed the lessee that it could contact the vendor for a statement of the warranties.

{¶ 18} The fourth paragraph required the lessee to obtain proof of insurance for the leased equipment, with the lessor listed as the loss payee. Chambers signed a lease confirmation form that indicated, among other things, that she was to forward the certificate of insurance to ILC.

{¶ 19} The sixth paragraph of the lease provided that, if the lessee defaulted, ILC could do the following:

{¶ 20} "(I) terminate the lease, (II) sue you for all past due payments AND ALL FUTURE PAYMENTS UNDER THIS LEASE, plus the Residual Value we have placed on the equipment and other charges you owe us, (III) repossess the equipment at your expense and (IV) exercise any other right or remedy which may be available under applicable law or proceed by court action to enforce the terms of this lease or recover damages. You will also pay for our reasonable collection and legal costs. In the event of your default under this lease, we may retain any security deposits to insure your performance under this lease. * * *."

{¶ 21} Under its eighth paragraph, the lease was characterized as a finance lease under Article 2A of the Uniform Commercial Code ("UCC"). Ohio's version of the UCC is found in R.C. Chapter 1310. Consequently, by signing the lease, Chambers agreed that she had either reviewed, approved, and received a copy of the supply contract or had been informed of the identity of the supplier, that she might have rights under the supply contract, and that she could contact the supplier for a description of those rights. That same paragraph claimed that, to the extent allowed by law, Chambers waived any of her rights and remedies under Article 2A of the UCC. The paragraph also contained an agreement that the lease payments were not subject to any reductions, claims, setoffs, or defenses.

{¶ 22} The agreement concluded with an integration clause stating that the lease constituted the entire agreement "and supercede[d] any prior conflicting agreements."

### III. After the Installation of the ATM

{¶ 23} Following the installation of the ATM, ILC's policy was to call the lessee to confirm that the machine had been delivered and was operating, and that the lessee understood the terms of the lease. On occasion, ILC was unable to make the contact. Because the failure to contact a lessee would delay the process of CCC getting its money from ILC, ILC's policy was to notify CCC so that CCC could make the contact. Upon CCC's making contact, a three-way telephone conversation would occur among the lessee, CCC, and ILC. An unidentified person called Chambers to determine whether the ATM was operable. She acknowledged that the ATM had been received and was working.

{¶ 24} Chambers received two checks drawn on CCC's account for the guaranteed revenues. The third check bounced. Chambers claimed that she quit making the lease payments because the check had bounced. She then received a call from someone who identified himself as an employee of ILC, during which she was asked why she had failed to make her lease payments. Her reason was "your check bounced." According to Chambers, the person told her that there was "an encoding problem with the checks, and that it would be corrected, and that [she] should continue to send lease payments." Documentary evidence offered by Chambers indicated that some unidentified ILC employee informed Chambers that the bounced check was from CCC, not ILC, and that the employee had advised Chambers of the reissue date of the check.

{¶ 25} From that conversation, Chambers stated, she understood that the guaranteed revenues would be coming from ILC. Chambers sent in her lease payment and again received no money on the guarantees. She then made no further lease payments.

{¶ 26} Both Chambers and her parents requested that ILC remove the ATM. (Apparently, there was a controversy between Chambers and her parents as to who owned the Maplewood Inn. This prompted the requests by Chambers' parents.) ILC did not do so.

### IV. The Trial Court's Decision

{¶ 27} ILC sued Chambers, alleging that she had breached the lease by not making the required payments. It sought damages of $13,321.74 for past due and future lease payments, late charges, unpaid taxes, and the residual value of the ATM. It also sought an unspecified amount of attorney fees and the return of the ATM. Following a bench trial, the court concluded that the lease was not unconscionable because Chambers was an experienced businessperson who had knowingly and voluntarily entered into the lease. The court indicated that Chambers had been involved in the restaurant business for twelve years and had "a degree of business acumen."

{¶ 28} The court further determined that ILC had a duty to mitigate its damages and that Chambers had failed to prove that ILC was bound by CCC's promises. It also concluded that R.C. Chapter 1310 governed the lease. It awarded ILC a total judgment of $2,896.33, limiting rental payments to the period from the inception of the lease to 90 days from Chambers's notification to ILC that she intended to breach the lease. It also awarded ILC possession of the ATM and found Chambers liable for the actual recovery and transportation of the ATM. It dismissed her counterclaims, which had been premised on agency principles.

## V. The Assignments of Error on Appeal and Cross–Appeal

{¶ 29} Both ILC and Chambers have appealed. We have consolidated the appeals. ILC raises three assignments of error. It contends that the trial court abused its discretion by imposing a duty on ILC to mitigate damages when such a duty is not recognized in R.C. Chapter 1310. ILC also asserts that the trial court abused its discretion by failing to award it certain damages. In its third assignment, ILC claims that the trial court erred by failing to grant it summary judgment.

{¶ 30} Chambers also asserts three assignments. She claims that the trial court erred in awarding ILC the cost of retrieving the ATM and its residual value. Chambers also contends that the trial court erred by failing to award her reasonable attorney fees and expenses in connection with her discovery motion. Chambers's last assignment asserts that the trial court erred by failing to conclude that CCC and ILC were engaged in an agency relationship and by failing to issue specific findings of fact and conclusions of law to support its determination to the contrary.

## VI. ILC's Assignments of Error

### A. Was the Trial Court Wrong in Finding that ILC Should Have Minimized its Damages?

#### 1. Finance Lease under Article 2A of the UCC and R.C. Chapter 1310.

{¶ 31} Neither party disputes that the commercial equipment lease in this case was a finance lease that implicated R.C. Chapter 1310. A finance lease differs from other leases. It is "a three-party transaction involving a manufacturer/supplier, a finance lessor (usually a financing company), and a finance lessee (the party that will use the particular personalty that is the subject of the transaction). The finance lessee selects the property that it needs from the supplier. Then either the finance lessee or the supplier approaches a financing company, which purchases the property and, in turn, leases it to the lessee. The sine qua non of a finance lease is that the finance lessor acts as the supplier of money and not as a merchant of goods."[1]

{¶ 32} Under R.C. 1310.01(A)(7), a lease is a finance lease if the lessor does not select, manufacture or supply the goods, and if the lessor acquires the goods in connection with the lease. Further, in the case of non-consumer leases, the lessee, before signing the lease, must be provided with written notice by the lessor of (1) the identity of the supplier, unless the lessee has selected the

---

1. Schoenfield, Commercial Law: The Finance Lease under Article 2A of the Uniform Commercial Code (1989), 1989 Ann.Surv.Am.L. 565, 566.

supplier and directed the lessor to acquire the goods; (2) the lessee's entitlement to the promises and warranties under R.C. Chapter 1310 that have been provided to the lessor by the supplier or any third party in connection with or as part of the contract between the supplier and the lessor; and (3) the right of the lessee to communicate with the supplier and to receive an accurate statement of the promises and warranties, including disclaimers, limitations, and remedies. When the elements are satisfied, "the finance lessor is an 'outsider' with respect to the goods and is only involved as the 'banker' of the transaction."[2]

{¶ 33} The results of characterizing a lease as a finance lease are that the lessee becomes a beneficiary of the supplier's promises and warranties to the lessor,[3] and that the lessee's promises under the lease become irrevocable and independent once the lessee has accepted the goods[4] and no longer has the limited right to revoke the acceptance.[5] The lessee's promises are not subject to "cancellation, termination, modification, repudiation, excuse, or substitution without the consent of the party to whom [they] run."[6] Thus, the lessee's promise to pay rent is "irrevocable and independent of any conditions as a matter of statutory law."[7] In other words, "In a non-consumer lease that qualifies as a finance lease under Article 2A, a lessee who has accepted the goods will have to pay the full rent come 'hell or high water,' as long as he has no right to revoke acceptance."[8] The lessee may, however, assert "certain defenses such as fraud or duress [and the law relative to principal and agent, estoppel and misrepresentation] pursuant to general principles of law and equity."[9] "Hell or high water" clauses "are standard in [commercial] finance leases because the quality of the leased goods is the responsibility of the supplier whose warranties extend through the lease to the lessee."[10]

---

2. 4B Lawrence's Anderson on the Uniform Commercial Code (Rev.2001) 392, Section 2A–103:19.

3. R.C. 1310.16.

4. R.C. 1310.46(A).

5. R.C. 1310.63.

6. R.C. 1310.46(B)(2).

7. Schoenfield, supra, at 577.

8. Id. at 580.

9. Schoenfield, supra, at 578, citing to Official Comment to U.C.C. 2A–407 (1987). See Official Comment 5 to U.C.C. 2A–407 (1990) and R.C. 1310.01(D) and 1301.03.

10. Garvin, The Changed (and Changing?) Uniform Commercial Code (1999), 26 Fla.St. U.L.Rev. 285, 292.

## 2. Minimization of Damages

{¶ 34} In its first assignment, ILC challenges the trial court's application of the doctrine of mitigation of damages when R.C. Chapter 1310 did not mandate its application. In its second assignment, it challenges the measure of damages based on the trial court's failure to apply R.C. Chapter 1310. We address these assignments together.

{¶ 35} Before we begin our analysis, we underscore that what is being challenged is the application of the principle of minimization of damages, which differs from mitigation of damages.[11] The principle of mitigation of damages "allows the defendant to reduce the amount of damages for which it is liable by showing extenuating facts or circumstances."[12] In contrast, the duty to minimize damages, also known as the avoidable consequences rule, requires the plaintiff to "use reasonable care to avoid loss."[13] Thus, the defendant cannot be charged with damages that the plaintiff "might have avoided with reasonable effort without undue risk, expense, or humiliation," because such harm either was not caused by the defendant or need not have been caused by the defendant.[14]

## 3. The Contractual Remedy

{¶ 36} Freedom of contract is the basic emphasis of Article 2A of the UCC and R.C. Chapter 1310. Thus, "most of the provisions of Article 2A can be 'drafted out' of an agreement, so with few exceptions Article 2A serves mainly to fill gaps that the parties did not expressly cover."[15] Consequently, the parties are free to draft their "own default and remedies sections even if different from Article 2A standards."[16]

{¶ 37} This is an unusual case because normally a lessor would repossess equipment to ensure that it is properly kept and maintained. Here, the lessee requested that the lessor arrange to remove the ATM, but the lessor refused to

---

11.  See *Chandler v. General Motors Acceptance Corp.* (1980), 68 Ohio App.2d 30, 32, 22 O.O.3d 18, 426 N.E.2d 521.

12.  *Harts Plaza Partners v. N.R. Dayton Mall* (July 16, 1990), 12th Dist. No. CA–89–11–066, 1990 WL 98223, quoting *First Natl. Bank of Akron v. Cann* (N.D.Ohio 1980), 503 F.Supp. 419, 422, affirmed (C.A.6, 1982), 669 F.2d 415.

13.  Id., quoting *First Natl. Bank of Akron v. Cann,* 503 F.Supp. at 421.

14.  *Chandler v. General Motors Acceptance Corp.,* 68 Ohio App.2d at 32, 22 O.O.3d 18, 426 N.E.2d 521, quoting Williston on Contracts (3 Ed.1968), Section 1353, at 274.

15.  Strauss, Equipment Leases under U.C.C. Article 2A—Analysis and Practice Suggestions (1992), 43 Mercer L.Rev. 853, 855.

16.  Id. at 860.

do so. Although ILC argues that it should have been awarded all past and future rents because R.C. Chapter 1310 did not require it to repossess and/or dispose of the ATM, the issue in this case, at least initially, involves a specific contractual provision agreed to by the parties—the acceleration clause. Before we look to the applicability of minimization principles to any of the remedies provisions in R.C. Chapter 1310, we must determine whether the contract's acceleration clause was enforceable. If it was, there is no need to apply the "gap filling" remedies of R.C. Chapter 1310.

{¶ 38} The lease agreement allowed ILC to accelerate the lease payments and to repossess the ATM. It also contained a provision stating that the lease payments were not subject to any setoffs or defenses. The lease contained no requirement that ILC minimize its damages.

{¶ 39} In Ohio, "[a]cceleration clauses in leases have generally been upheld as long as the lease also requires the lessor to mitigate [minimize] damages."[17] In the leading case, *Frank Nero Auto Lease, Inc. v. Townsend,*[18] the motor vehicle lease agreement allowed the lessor to accelerate lease payments and to repossess the car. The default provision allowed the lessor to relet or resell the car and collect rents for the entire lease term, thus allowing double payment for the leased car. The court concluded that the clause was against public policy because it bore "no reasonable relationship to the damages incurred."[19] It held that the lease provision was invalid and unenforceable.

{¶ 40} In calculating the correct measure of damages where an acceleration clause was found to be unenforceable, the court looked to damages principles applied to bailment and real property cases. It held that where a vehicle is repossessed, the damages consist of all the unpaid rent that had accrued at the time of the repossession, plus interest on those rent payments, and the cost of repossession.[20]

{¶ 41} In *Telmark, Inc. v. Liff,*[21] a case involving a lease entered into after R.C. Chapter 1310 had become effective, the lessor sought damages under an acceleration clause in its lease for a "no-til planter," after it had repossessed the planter. That acceleration clause required the lessor to minimize its damages by releasing or reselling the equipment. After repossession, the lessor failed to re-

---

17. *Telmark, Inc. v. Liff* (Sept. 21, 1998), 12th Dist. No. CA98–01–004.

18. *Frank Nero Auto Lease, Inc. v. Townsend* (1979), 64 Ohio App.2d 65, 18 O.O.3d 44, 411 N.E.2d 507.

19. Id. at 69, 18 O.O.3d 44, 411 N.E.2d 507.

20. Id. at 71–72, 18 O.O.3d 44, 411 N.E.2d 507.

21. *Telmark, Inc. v. Liff,* supra.

lease or sell the planter for two years. The appellate court determined that the lessor was not entitled to the full amount under the acceleration clause because it had failed to minimize its damages. But it concluded that the trial court had erred by awarding no damages at all. Recognizing that a plaintiff's failure to minimize its damages only precludes it from recovering damages that it could have avoided by minimization, the appellate court decreased the full amount due under the acceleration clause by the amount that the lessor could have avoided in damages by minimization. The appellate court in *Telmark* made no reference to Article 2A of the UCC or to R.C. Chapter 1310.

{¶ 42} *Tokai Financial Services v. Mathews, Gallovic, Granito & Co.*[22] involved an equipment lease that contained an acceleration clause that required the lessor to sell or find a new lease upon the return or repossession of the equipment. The appellate court concluded, "By the inclusion of such a mitigation clause, a rational relationship between the impact of the acceleration clause and the actual damages sustained is assured. Accordingly the acceleration clause was enforceable as it included a clause obligating the lessor to mitigate its damages."[23] The court recognized that "[a]t common law and under the U.C.C., the lessor must use reasonable efforts to mitigate its ordinary and expected damages."[24]

{¶ 43} Ohio is not the only state that has concluded that an acceleration clause does not abrogate the common-law duty to minimize damages. Idaho recognized the duty of a lessor to minimize its damages in *Industrial Leasing Corporation v. Thomason.*[25] In that case, the court held that such a rule "discourage[s] idleness of productive property and [is] in keeping with the generally accepted damages rules in other commercial law transactions."[26] The Idaho Supreme Court has reaffirmed this holding as recently as 1996.[27] Other courts ruling the same way include New York[28] and Washington.[29]

---

22. See *Tokai Financial Serv., Inc. v. Mathews, Gallovic, Granito & Co.* (Nov. 24, 1995), 11th Dist. No. 95–L–098, 1995 WL 803582.

23. Id.

24. Id., citing U.C.C. 2A–523, R.C. 1310.69, and *S & D Mech. Contrs., Inc. v. Enting Water Conditioning Sys., Inc.* (1991), 71 Ohio App.3d 228, 238, 593 N.E.2d 354.

25. *Indus. Leasing Corp. v. Thomason* (1974), 96 Idaho 574, 532 P.2d 916.

26. Id. at 577, 532 P.2d 916.

27. See *Consolidated Ag of Curry, Inc. v. Rangen, Inc.* (1996), 128 Idaho 228, 912 P.2d 115.

28. See *Vanguard Commercial Leasing Corp. v. Dayanzadeh* (1989), 147 A.D.2d 557, 538 N.Y.S.2d 492.

29. See *Northwest Collectors, Inc. v. Enders* (1968), 74 Wash.2d 585, 446 P.2d 200. But, see, *Woods v. Advanta Leasing Corp.* (1991), 201 Ga.App. 844, 412 S.E.2d 607.

{¶ 44} We conclude that, under Ohio common law, the acceleration clause in this lease agreement was not enforceable as a matter of public policy because it failed to include an obligation on the part of ILC to minimize its damages. Because the acceleration clause was unenforceable, we must look to R.C. Chapter 1310 to determine what remedies and damages were available to ILC as a result of Chambers's failure to make the lease payments.

### 4. Application of R.C. Chapter 1310 Remedies

{¶ 45} The application of R.C. Chapter 1310 requires us to address ILC's contention that because it had no duty under that chapter to repossess and dispose of the ATM, it had no duty to minimize its damages. While we recognize that the rights of repossession and disposition of leased goods under R.C. Chapter 1310 are permissive and not mandatory, we hold that the enactment of R.C. Chapter 1310 did not displace the concept of minimization of damages. We premise our holding on two theories. First, the specific remedy provisions of R.C. Chapter 1310 are written as if the lessor had minimized its damages. Second, the general principles contained in R.C. Chapter 1301, which apply to R.C. Chapter 1310, incorporate the principle of minimization.

{¶ 46} R.C. 1310.69 provides an index of the lessor's remedies and damages on the lessee's default. R.C. 1310.73, 1310.74, and 1310.75 provide the means to calculate the lessor's damages when the lessee's default has been material. A material default includes the failure to make lease payments.[30] R.C. 1310.69(B) provides a remedy when the lessor does not fully exercise its rights or obtain a remedy under specific sections of R.C. Chapter 1310. While there is no "duty" to minimize damages under R.C. Chapter 1310, at least two of the three specific provisions presuppose the lessor's disposal of the goods and contain the minimization principle in the calculation of applicable damages.

{¶ 47} Under R.C. 1310.73, it is assumed that the lessor will repossess the goods and dispose of them by a lease that is made in good faith and in a commercially reasonable manner and that is substantially similar to the original lease. The damages provided include, in part, accrued and unpaid rent as of the date of the commencement of the new lease and "[t]he present value, as of the same date, of the total rent for the then remaining lease term of the original lease agreement minus the present value, as of the same date, of the rent under the

---

30. R.C. 1310.69.

new lease agreement applicable to that period of the new lease term that is comparable to the then remaining term of the original lease agreement."[31]

{¶ 48} Similarly, R.C. 1310.74 applies to situations where there has also been repossession. Under that provision, the lessor retains the goods, disposes of the goods by some means other than a lease, or re-leases the goods under a lease that is not substantially similar to the original lease. The damages in this provision include accrued and unpaid rent "as of the date of the default, if the lessee has never taken possession of the goods or, if the lessee has taken possession of the goods, as of the date the lessor repossesses the goods or an earlier date on which the lessee makes a tender of the goods to the lessor" and the "present value as of the date determined [above] of the total rent for the then remaining lease term of the original lease agreement minus the present value as of the same date of the market rent at the place where the goods are located computed for the same lease term."[32]

{¶ 49} If that measure of damages fails to place the lessor in as good a position as performance under the lease would have, the lessor can collect as damages "the present value of the profit, including reasonable overhead, the lessor would have made from full performance by the lessee, together with any [allowed] incidental damages * * *, due allowance for costs reasonably incurred, and due credit for payments or proceeds of disposition."[33] This measure of damages generally applies to a loss-volume lessor or a lessor who has specialty goods that cannot be re-leased, i.e., a display sign made for a specific company.[34] A lessor who buys the goods only after obtaining a lease is a loss-volume lessor where "it would have had an additional lease had the repudiating lessee not repudiated."[35] In other words, the lessor must have had the capacity to make an additional profitable lease and would have done so absent the lessee's breach.[36]

{¶ 50} Under R.C. 1310.75, the lessor may sue for rent. Under this provision, if the lessor holds for the remaining lease term any goods that have been identified in the lease agreement and that are in its control, it may collect the following damages. If the goods have been accepted by the lessee and not repossessed by or tendered to the lessor, the lessor may recover accrued and

**31.** R.C. 1310.73(B).

**32.** R.C. 1310.74.

**33.** R.C. 1310.74(B).

**34.** 5 Lawrence's Anderson on the Uniform Commercial Code at 1063, Section 2A–528.9.

**35.** See id. at 1065, Section 2A–528:11.

**36.** See id. at 1064, Section 2A–528:11.

unpaid rent as of the date of judgment in its favor, the present value as of the judgment date of the rent for the remaining lease term and any incidental damages minus expenses saved as a result of the default.[37] If, after a reasonable effort, the lessor is unable to dispose of goods identified in the lease at a reasonable price or circumstances indicate that it would be futile to do so, the lessor may collect accrued and unpaid rent as of the date of the judgment, the present value, as of that date, of the rent for the remainder of the lease term, and incidental damages.[38]

{¶ 51} If the goods are disposed of before collection of a judgment for damages and the disposition is before the end of the lease term, R.C. 1310.73 or 1310.74 applies, and the lessor must provide a credit against the judgment to the extent the judgment amount exceeds the recovery available under those sections.[39] If the lessee pays a judgment of damages under R.C. 1310.75(A), it is entitled to use and possess the goods for the remainder of the lease term, if they have not been disposed of.[40] If a lessor is not entitled to rent, its damages must be calculated for nonacceptance under R.C. 1310.73 or 1310.74.[41]

{¶ 52} According to one commentator, the language "not repossessed or tendered to the lessor" is in R.C. 1310.75 to make lessors minimize their damages.[42] Under 2A–529(1)(b) of the UCC and R.C. 1310.75(A)(1), "if the goods are in the possession of or available to the lessor, and if they have some reasonable lease or sale possibility, the lessor is under a duty to make such a sale or lease. Failing so to re-lease or sell, the lessor loses the rents that it could otherwise recover from the lessee. This section is a large incentive to the lessor to mitigate."[43]

{¶ 53} Official Comment One to Article 2A–529 of the UCC, the counterpart to R.C. 1310.75, is also instructive. This damages provision is proper "only if the lessee retains possession of the goods or the lessor is or apparently will be unable to dispose of them at a reasonable price after reasonable effort. There is no general right in a lessor to recover the full rent from the lessee upon holding the

---

37. R.C. 1310.75(A)(1).

38. R.C. 1310.75(A)(2).

39. R.C. 1310.75(C).

40. R.C. 1310.75(D).

41. R.C. 1310.75(E).

42. See 2 White and Summers, Uniform Commercial Code Series (4 Ed.1995), 39, Section 14–3.

43. Id. at 41, Section 14–3.

goods for the lessee. If the lessee tenders goods back to the lessor, and the lessor refuses to accept tender, the lessor will be limited to the damages it would have suffered had it taken back the goods. * * * In a lease, the lessor always has a residual interest in the goods which the lessor usually realizes upon at the end of a lease term by either sale or a new lease. Therefore, it is not a substantial imposition on the lessor to require it to take back and dispose of the goods if the lessee chooses to tender them back before the end of the lease term; the lessor will merely do earlier what it would have done anyway, sell or relet the goods."[44]

{¶ 54} An action to recover the rent due under the contract is an extraordinary remedy.[45] This is because the lessee does not become the true owner of the goods even when it pays the entire rent under the lease agreement.[46] When the lessee breaches the lease agreement, the lessor has the right to repossess the goods. To hold the lessee liable for the entire rent due would penalize the lessee out of proportion to the damage to the lessor and would give a windfall to the lessor, who can re-lease or sell the goods.[47] Thus, an action for rent is limited, unless otherwise agreed, to situations where the lessee intends to retain the goods and the lessor does not repossess them, where conforming goods are lost or damaged after the lessee has assumed the risk of loss, and where the lessor is unable to dispose of the goods after a reasonable effort.[48]

{¶ 55} Finally, under R.C. 1310.69(B), if the lessor does not fully exercise a right of possession or disposal or obtain a remedy to which it is entitled under R.C. 1310.69, the lessor "may recover the loss resulting in the ordinary course of events from the lessee's default as determined in any reasonable manner, together with incidental damages, less expenses saved in consequence of the lessee's default." This catch-all provision allows a court to craft a proper remedy when the others are unavailable or do not serve to make the lessor whole. The only restraint on the trial court is that the damages must be calculated in a reasonable manner. Obviously, the application of the common-law principle of minimization would not be unreasonable.

{¶ 56} Even if the remedies and damages provisions of R.C. Chapter 1310 did not specifically incorporate the minimization principle, that principle is embedded

---

44. Official Comment 1 to Article 2A–529 (1993).

45. See 5 Lawrence's Anderson on the Uniform Commercial Code at 1082, Section 2A–529:6.

46. See id. at 1082, Section 2A–529:5.

47. See id.

48. See id. at 1083, Section 2A–529:6.

in the general provisions found in R.C. Chapter 1301.[49] R.C. 1310.01(D) states that the terms and principles in R.C. Chapter 1301 are applicable to R.C. Chapter 1310. R.C. 1301.03 states that unless a particular provision displaces principles of law, those principles supplement the provisions. R.C. 1301.06 provides that the remedies of R.C. Chapter 1310 are to be "liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed, but neither consequential or special nor penal damages may be had except as specifically provided [in R.C. Chapter 1310] or by other rule of law."

{¶ 57} Official Comment One to 1–106 of the UCC states that the purpose of this section, in part, is "to make it clear that compensatory damages are limited to compensation. They do not include consequential or special damages, or penal damages; and the Act elsewhere makes it clear that damages must be minimized." The comment then cites to several sections of the UCC, including Section 1–203 (which is R.C. 1301.09). R.C. 1301.09 imposes an obligation of good faith in the enforcement of every contract or duty within R.C. Chapter 1310. "Good faith" is defined in R.C. 1310.01(C)(2) as it is in R.C. 1302.01: "honesty in fact and observance of reasonable commercial standards of fair dealing in the trade." These provisions demonstrate that the UCC and Ohio's adoption of it have not abrogated the principle of minimization.[50]

{¶ 58} Thus, we conclude that both common law and R.C. Chapter 1310 require a lessor to minimize its damages. We overrule ILC's first assignment.

## B. What Was the Correct Measure of Damages?

{¶ 59} The unique facts in this case involve a situation where the lessee offered the return of the leased equipment to the lessor by requesting several times that the lessor make arrangements to retrieve the ATM. The lessor refused to do so. These facts do not fall directly under R.C. 1310.73 or 1310.74, each of which presupposes possession and subsequent disposal or retention. ILC argues that it was entitled to damages under the acceleration clause as allowed by R.C. 1310.75. But damages did not fall under R.C. 1310.75 because ILC did not repossess the ATM, and because the evidence demonstrates that Chambers did not intend to retain the ATM, choosing instead to make it available to ILC. This is not one of those extraordinary cases to which R.C. 1310.75 applies.

---

49. See Benfield, Lessor's Damages Under Article 2A After Default by the Lessee as to Accepted Goods (1988), 39 Ala.L.Rev. 915.

50. Cf. *Federal Signal Corp. v. Safety Factors, Inc.* (1994), 125 Wash.2d 413, 886 P.2d 172; *Schiavi Mobile Homes, Inc. v. Gironda* (Me.1983), 463 A.2d 722; *TCP Indus., Inc. v. Uniroyal, Inc.* (C.A.6, 1981), 661 F.2d 542. See *Tokai Financial Serv., Inc. v. Mathews, Gallovic, Granito & Co.*, supra.

{¶ 60} The trial court measured damages as allowed under *Frank Nero Auto Lease, Inc. v. Townsend.*[51] It held Chambers liable for rental payments from the inception of the lease to 90 days from her notice of her intent to breach the lease.

{¶ 61} This measure of damages was not based on any of the provisions of R.C. Chapter 1310. This was wrong. ILC's damages should have been based on R.C. 1310.74(A), as provided by R.C. 1310.75(E).

{¶ 62} By refusing to obtain the ATM after it was available, ILC should have been treated as a lessor who had retained the goods. Thus, ILC was entitled to accrued and unpaid rent as of the date Chambers made the ATM available to ILC, July 10, 2001, the day her attorney sent the letter requesting its retrieval. It was also entitled to the present value on that date of the total rent for the remaining term of the original lease minus the present value on the same date of the market rent at the place where the goods were located (Athens, Ohio), computed for the same lease term. ILC was also entitled to any incidental damages allowed under R.C. 1310.76, minus expenses saved in consequence of Chambers's default. Market-rent proof is recognized under R.C. 1310.53. Present value is defined in R.C. 1310.01(A)(21).

{¶ 63} Simply stated, the lessor, ILC, was entitled to the unpaid rent and the present value of the future rent, less the value of the ATM, plus any incidental damages.

{¶ 64} Although ILC has not explicitly challenged the amount of the award, such a challenge is implicitly raised in its second assignment, which concerns the trial court's failure to award it damages under R.C. Chapter 1310. Because the trial court failed to use the correct measure of damages, a new hearing on the assessment of damages is required. We must remand this case with instructions that the trial court make a determination in accordance with the correct measure of damages. Accordingly, we sustain ILC's second assignment.

### C. Did the Trial Court Err by Not Granting ILC Summary Judgment?

{¶ 65} In its third assignment, ILC argues that the trial court erred by not granting it summary judgment for the accelerated rent as a result of Chambers' breach of the lease. Based on our disposition of ILC's first assignment, we find no merit in this assignment.

### VII. Chambers's Cross–Appeal

### A. Transportation Costs and Residual Value

{¶ 66} Chambers's first assignment in her cross-appeal asserts that the trial court erred in awarding ILC the cost of transporting the ATM when it had

---

51. *Frank Nero Auto Lease, Inc. v. Townsend,* supra.

not been removed and the residual value of the ATM where the value had not been proved. R.C. 1310.76 allows as incidental damages "any commercially reasonable charges, expenses, or commissions incurred * * * in the transportation * * * of goods after the lessee's default, in connection with the return or disposition of the goods, or otherwise in connection with the default." In this situation, because ILC had not yet repossessed or disposed of the ATM, it had not *incurred* the expenses of the ATM's transportation. Further, ILC had not sought incidental damages in its complaint. Thus ILC was not entitled to be paid for coming and getting the ATM because it never came and got it.

{¶ 67} Chambers also challenges the residual value of $972.70. Under the lease, Chambers was obligated to reimburse ILC for the residual value of the machine. But it was ILC's burden to prove the amount of damages with reasonable certainty.[52] The evidence at trial was that the ATM, at the time it was delivered to Chambers, had a manufacturer's price of $4,500. ILC had paid $11,000 for it. The value of ATMs like the one that had been leased by Chambers has decreased due to technological changes. ILC currently can sell an ATM in the market for $500 to $1,700 depending on its condition. There was no evidence as to the condition of the ATM, and no evidence whatever of the amount of $972.70, except that that amount was stated in the complaint, which is not evidence. Based on the evidence, we conclude that ILC failed to meet its burden. Thus, we sustain Chambers's first assignment.

### B. Attorney Fees for Discovery Violation

{¶ 68} In her second assignment, Chambers contends that the trial court erred in not awarding her reasonable attorney fees and expenses on her discovery motion. This assignment is based on the failure of opposing counsel to provide a witness for a scheduled deposition due to his recording of the deposition on the wrong date. Opposing counsel subsequently appeared with the witness for a deposition in the Athens, Ohio, office of Chambers's attorney. Chambers moved for discovery sanctions under Civ.R. 37(D) and (B). ILC opposed the motion, and Chambers replied. The total amount sought was $1,269.80. The trial court failed to rule on Chambers's motion.

{¶ 69} Civ.R. 37(D) mandates that when a corporate officer fails to appear for a deposition after proper notice, the court "shall" require the officer, his or her advising attorney or both "to pay the reasonable expenses, including attorney's fees caused by the failure, unless the court expressly finds that the failure was substantially justified or that the circumstances make an award of expenses

---

52. See *Staffing America v. Titan Distribution Serv., Inc.* (Sept. 29, 2000), 1st Dist. No. C–990679, 2000 WL 1434172.

unjust." Thus, "[t]he language of Civ.R. 37(D) mandates an order of reasonable expenses unless the trial court makes an express finding indicating otherwise."[53] Here, it would have been reasonable for the trial court to conclude that providing the witness at Chambers's attorney's office in Athens made the violation moot.

{¶ 70} In this case, the court failed to rule on the motion. Generally, when a trial court fails to rule on a pretrial motion, it is presumed to have overruled it.[54] And, by overruling the motion for discovery sanctions, the trial court would, under Civ.R. 37(D) have needed to make express findings that the failure of ILC's officer to attend his deposition was substantially justified or that an award of reasonable expenses was unjust.

{¶ 71} But there is another general legal principle that is applicable under these facts, because Chambers failed to bring to the trial court's attention its failure to rule on her motion. "An appellate court need not consider any error which the complaining party could have, but did not, call to the trial court's attention at a time when the error could have been avoided or corrected by the trial court."[55] Because Chambers failed to bring to the trial court's attention its failure to rule on her motion and the need to make express findings if it overruled her motion, we conclude that her second assignment is not well taken.

### C. Apparent Agency

{¶ 72} In her third assignment, Chambers contends that the trial court erred by concluding that McCarthy was not an agent of ILC under the theory of apparent agency, and by failing to make specific findings as to the elements of apparent agency.

{¶ 73} Obviously, if ILC had a principal-agent relationship with McCarthy and CCC, it might be liable for all the promises and guarantees of the bankrupt company.

{¶ 74} The trial court provided six pages of findings of fact and conclusions of law. Civ.R. 52 mandates that a trial court enter written findings of fact and conclusions of law if, following a bench trial, one of the parties requests them. The purpose of the rule is to adequately allow the reviewing court in "determining the validity of the trial court's judgment."[56] Chambers's claim is

---

53. *Bernard v. Bernard,* 7th Dist. No. 00 CO 25, 2002-Ohio-552, 2002 WL 206411; see *Soloman v. Excel Marketing, Inc.* (1996), 114 Ohio App.3d 20, 28, 682 N.E.2d 724.

54. See *Newman v. Al Castrucci Ford Sales, Inc.* (1988), 54 Ohio App.3d 166, 561 N.E.2d 1001.

55. *Restivo v. Fifth Third Bank of Northwestern Ohio, N.A.* (1996), 113 Ohio App.3d 516, 522, 681 N.E.2d 484.

56. *Long v. Grinnell* (Mar. 16, 1995), 8th Dist. No. 67077, 1995 WL 116953.

that the findings of fact and conclusions of law were insufficient because the trial court failed to make a specific finding on each of the elements of apparent agency. We do not read Civ.R. 52 so narrowly under these facts. "A trial court ruling which recites various facts and a legal conclusion satisfies the requirements of Civ.R. 52 where, when considered in conjunction with other parts of the trial record, an adequate basis exists upon which an appellate court may conduct its review."[57] We can tell from its findings of fact in this case what the trial court considered persuasive—the language of the lease contract itself. Further, this is not a case where appellate review turns on whether the trial court relied on or disregarded incompetent evidence in reaching its conclusion.

{¶ 75} That having been said, we turn to the merits of the trial court's conclusion that McCarthy (and, hence, CCC) was not ILC's agent for the purpose of his revenue and advertising guarantees.

{¶ 76} Chambers's theory is that but for the guaranteed revenues, she would not have entered the lease. We have no doubt that is probably the case. Because she believes that CCC and ILC were one and the same, she argues that ILC should have been held liable for the promises made by CCC.

{¶ 77} In Ohio, "in order for a principal to be bound by the acts of his agent under the theory of apparent agency, evidence must affirmatively show: (1) that the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of those facts and acting in good faith had reason to believe that the agent possessed the necessary authority."[58] Chambers, as the "party asserting the existence of an agency relationship, b[ore] the burden of proof."[59] "A principal and agent relationship exists 'when one party exercises the right of control over the actions of another, and those actions are directed toward the attainment of an objective which the former seeks.'"[60] Chambers alleges that ILC fraudulently induced her into entering the lease by guaranteeing certain revenue. By doing so, Chambers is seeking, in effect, to rescind the lease. Thus, we must determine if Chambers demonstrated that ILC held CCC (and, hence, McCarthy) out to the public as having the authority to guarantee revenues on ILC's behalf.

---

57. Id.

58. *Master Consolidated Corp. v. BancOhio Natl. Bank* (1991), 61 Ohio St.3d 570, 575 N.E.2d 817, syllabus.

59. *Grigsby v. O.K. Travel* (1997), 118 Ohio App.3d 671, 675, 693 N.E.2d 1142.

60. Id., quoting *Hanson v. Kynast* (1986), 24 Ohio St.3d 171, 173, 494 N.E.2d 1091.

{¶ 78} The following facts are undisputed. McCarthy met with Chambers approximately a week before April 18, 2000. (Based on the March 31, 2000, date on the lease application and the Merchant Processing Agreement, that is most likely the date of the first meeting.) There was little conversation, according to Chambers, but she signed the lease application that day. The lease application was provided by CCC and designated as a CCC lease application. It contained no mention of ILC. The lease indicated that she was applying for credit for a business purpose and that CCC was a vendor. Also, the day that Chambers signed the application, McCarthy left her a CCC advertisement on which he had written the guaranteed revenues.

{¶ 79} McCarthy did not inform her to whom the application would be forwarded. He returned on April 18 with ILC's lease agreement and the accompanying documents, and CCC's forms, including the numbers for the guaranteed revenues. Chambers claims that she was fraudulently induced to sign the lease because (1) McCarthy did not tell her that ILC was a corporate entity separate from CCC; and (2) she believed the companies were the same because (a) she was not told otherwise, (b) McCarthy used "we" when he referred to the lease and the guarantees, and (c) McCarthy said that he was a salesperson for the ATM. Chambers also testified that the guaranteed revenues were intended to induce her to sign the lease.

{¶ 80} At the time Chambers signed the lease, ILC was one of 15 leasing companies that CCC used. ILC had no right to control CCC's conduct in the field. It was aware that CCC had programs available to its ATM users that provided payments to them, including various components of revenue, and ILC's witness had heard from someone other than CCC that CCC had promised potential lessees up to $200 monthly if the lessees signed leases. One of the reasons that it did not specifically inform lessees that it was not bound by CCC's promises was that other leasing companies did not. It is undisputed that ILC and CCC had entered into an agreement *after* Chambers's lease was executed to ensure that lessees were aware that CCC's inducements and ILC's leases were two separate and distinct transactions.

{¶ 81} Further, at the time Chambers entered into the lease, ILC was unaware of any circumstances that would have led it reasonably to conclude that CCC did not intend to honor its agreement with Chambers.

{¶ 82} CCC submitted Chambers's lease application to ILC for approval. Only ILC could approve the lease. Once ILC approved Chambers's application, CCC delivered the lease agreement and other documents to Chambers for her signature. CCC then returned the lease and its related documents to ILC. ILC executed the lease. According to Paris, this was "everyday industry standard practice in the vendor leasing area." Chambers paid the first and last months'

rent under the lease by a check made payable to the order of CCC, and that payment was credited to her.

{¶ 83} If we assume for purposes of argument only that CCC was a limited agent of ILC for the purposes of transferring documents to and from prospective lessees, we must determine whether the above facts established that CCC's authority was extended under the doctrine of apparent authority to make promises of guaranteed revenue on ILC's behalf. If it was, ILC was bound by McCarthy's promises. But "a finding of agency by apparent authority or agency by estoppel must be based upon words or conduct by the principal. * * * The assurances of one who assumes to act as an agent of his authority to bind another are not, standing alone, sufficient to prove his agency." The putative agent cannot create apparent agency alone. '

{¶ 84} Chambers claims fraudulent inducement, which requires that the following be shown: "(1) an actual or implied false representation concerning a fact or, where there is a duty to disclose, concealment of a fact, material to the transaction; (2) knowledge of the falsity of the representation or such reckless-ness or utter disregard for its truthfulness that knowledge may be inferred; (3) intent to induce reliance on the representation; (4) justifiable reliance; and (5) injury proximately caused by the reliance."[61] In this case, the fraudulent inducement was allegedly the guaranteed revenues.

{¶ 85} There was no evidence that ILC made the representation that ILC and CCC were the same company. There was no evidence that Chambers's decision to enter into the lease was based on the companies' being the same company. At the time Chambers was dealing with McCarthy, she believed that he was the sales representative for the ATM.

{¶ 86} There was no evidence at the time Chambers entered into the lease that CCC was to do anything other than serve as a conduit of lease forms between several leasing firms, including ILC, and potential lessees. The evidence showed that McCarthy "at most, was a limited or special agent *only* acting as a loan-referral source" for ILC.[62] In this capacity, McCarthy had no power to bind ILC to a loan agreement.

{¶ 87} In summary, the evidence presented by Chambers was that ILC furnished CCC with the forms it customarily used in its business. "This fact

---

**61.** *Yo–Can, Inc. v. The Yogurt Exchange, Inc.*, 149 Ohio App.3d 513, 525, 2002-Ohio-5194, 778 N.E.2d 80, ¶ 42.

**62.** *Williams v. ITT Financial Serv.* (June 25, 1997), 1st Dist. No. C–960234, 1997 WL 346137.

alone, however, [was] insufficient to establish an agency relationship * * *. Such a practice is common in the commercial community."[63]

{¶ 88} The lease clearly indicated that CCC was the vendor, that ILC was the lessor, and that Chambers was the lessee. It stated that ILC was not responsible for the vendor's acts. It also provided that the lease constituted the entire agreement between the lessee and the lessor. There was no evidence that McCarthy represented that the companies were the same or that ILC was aware that he was doing so. In our view, the trial court was correct in concluding that Chambers had failed to demonstrate that CCC had sufficient apparent authority to make guaranteed promises of revenue on behalf of ILC, or that she had reason to believe that it did.

{¶ 89} Further, even if ILC could have been held liable for McCarthy's representations under the doctrine of apparent agency, Chambers would not have prevailed under her claim of fraudulent inducement. The evidence failed to demonstrate that, at the time McCarthy presented the lease to Chambers, the guarantees were false, or that he had possessed actual fraudulent intent.[64] The only evidence was that sometime after Chambers entered into the service agreement with CCC and the lease with ILC, CCC defaulted on paying the guaranteed revenues and later filed for bankruptcy. Thus, we conclude that Chambers failed to demonstrate fraudulent inducement. We overrule Chambers's third assignment.

## VIII. Conclusion

{¶ 90} The trial judge got it mainly right. We affirm the judgment for ILC insofar as it concerns Chambers's underlying liability for damages. But, as to the appeal numbered C–0200461, we reverse that part of the trial court's judgment (1) awarding ILC transportation costs, and (2) awarding ILC the residual value of the ATM, as that value was not proved. As to the appeal numbered C–020436, we vacate that part of the judgment awarding damages to ILC in the amount of $2,896.33. We remand the case for a recomputation of the damage award and late fees using the measure of damages under R.C. 1310.74. The trial court may in its discretion receive additional evidence as to damages.

Judgment affirmed in part,
reversed in part
and cause remanded.

HILDEBRANDT, P.J., and SUNDERMANN, J., concur.

---

63. *XYOQUIP, Inc. v. Mims* (N.D.Miss.1976), 413 F.Supp. 962, 965.

64. Accord *Williams v. Edwards* (1998), 129 Ohio App.3d 116, 717 N.E.2d 368.