DECISION.
{¶ 1} Plaintiff-appellant/cross-appellee, Information Leasing Corporation ("ILC"), appeals the judgment of the Hamilton County Court of Common Pleas in a breach-of-contract action. In a cross-appeal, defendant-appellee/cross-appellant, Darlene Borda, appeals the trial court's dismissal of her counterclaims. For the following reasons, we affirm the judgment of the trial court in part, reverse it in part, and remand the cause for further proceedings.
 {¶ 2} Borda owned two stores in New Jersey. In June 1998, a representative of Credit Card Corporation ("CCC") approached her about leasing two automatic teller machines ("ATMs") to be placed in her businesses. Subsequently, Borda entered into lease agreements with ILC pursuant to which she was to pay monthly rent of $306.64 for each machine for a period of sixty months. Borda entered into a separate agreement with CCC pursuant to which she was to receive a portion of each transaction surcharge from the ATMs.
 {¶ 3} In late 2000, the ATMs reportedly began to malfunction. A representative of CCC took possession of the ATMs, and Borda then entered into a lease agreement with a different lessor for two new machines. Borda ceased making payments on the ILC leases, and ILC filed suit for damages under the lease agreement. After a bench trial, the trial court awarded ILC damages in the amount of $1,838.04, representing unpaid rental from the inception of the leases to ninety days from the date that Borda had notified ILC of her intention to cease making rental payments. The court also awarded ILC late charges of $183.78, the prorated residual value of the ATMs in the amount of $1,129.88, and court costs.
 {¶ 4} ILC advances two assignments of error in support of its appeal. In its first assignment of error, ILC argues that the trial court erred in failing to apply the damages provisions of R.C. Chapter 1310. In the second assignment of error, ILC maintains that the trial court erred in failing to award damages pursuant to R.C. Chapter 1310 based upon its conclusion that ILC would have received a windfall. Because the assignments raise similar issues, we discuss them together.
 {¶ 5} The crux of ILC's argument in support of its assignments is that the trial court erred in fashioning an award of damages that ignored the provision of the lease agreements stating that Borda had "an UNCONDITIONAL OBLIGATION to make all payments due under this Lease, and that Lessee cannot withhold, set off or reduce such payments for any reason."
 {¶ 6} In International Leasing Corporation v. Chambers,[1] this court was asked to determine damages under a lease substantially similar to the leases in the case at bar. In Chambers, we held that the trial court had erred in awarding damages based upon rental payments due from the inception of the lease to ninety days after the notice of the intent to breach the lease.[2] We stated that such a measure of damages was not based upon any of the provisions of R.C. Chapter 1310 and held that the lessor was entitled to damages under R.C. 1310.74(A).[3] That section provides that the lessor may recover the following: "(1) Accrued and unpaid rent as of the date of default, if the lessee has never taken possession of the goods or, if the lessee has taken possession of the goods, as of the date the lessor repossesses the goods or an earlier date on which the lessee makes a tender of the goods to the lessor; (2) The present value as of the date determined under division (A)(1) of this section of the total rent for the then remaining lease term of the original lease agreement minus the present value as of the same date of the market rent at the place where the goods are located computed for the same lease term; [and] (3) Any incidental damages allowed under section1310.76 of the Revised Code, less expenses saved in consequence of the lessee's default."[4]
 {¶ 7} In determining that damages were to be computed with reference to R.C. 1310.74(A), we emphasized that the lessee had tendered the ATM to the lessor but that the lessor had not repossessed the machines.[5] Thus, the minimization-of-damages formula embodied in R.C. 1310.74(A) was held to be applicable to the transaction.
 {¶ 8} In the case at bar, though, the evidence demonstrates that Borda did not tender the goods to ILC. In January 2001, CCC approached Borda and offered to install new ATMs that belonged to a different lessor. In return, CCC was to pay the balance due from Borda to ILC. CCC did in fact remove the machines but failed to make the remaining lease payments to ILC. Meanwhile, ILC continued to request the lease payments from Borda.
 {¶ 9} It was not until three months after the removal of the machines that Borda notified ILC that CCC had removed the ATMs and replaced them with new ones. The evidence was undisputed that Borda had breached that provision of the ILC leases requiring written authorization from ILC for any removal or disposition of the goods. Because ILC did not give its consent for the removal of the machines and had no knowledge of their removal, it was never given the opportunity to repossess the machines so that it could minimize its damages.
 {¶ 10} Under these circumstances, the damages provisions of R.C.1310.75 applied, because the ATMs constituted "goods accepted by the lessee and not repossessed by or tendered to the lessor," within the meaning of R.C. 1310.75(A)(1). The correct measure of damages under R.C.1310.75(A)(1) was the sum of the "(a) Accrued and unpaid rent as of the date of entry of judgment in favor of the lessor; (b) The present value as of the same date of the rent for the then remaining lease term of the lease agreement; [and] (c) Any incidental damages allowed under section1310.76 of the Revised Code, less expenses saved in consequence of the lessee's default."
 {¶ 11} Therefore, the trial court did err in awarding damages under the formula we found to be erroneous in Chambers. We sustain ILC's assignments of error, reverse that portion of the trial court's judgment awarding damages, and remand the cause for a determination of damages under R.C. 1310.75(A)(1).
 {¶ 12} In her cross-appeal, Borda advances a single assignment of error, in which she maintains that the lower court erred in denying her counterclaims against ILC. Borda first argues that her leases with ILC were unconscionable because she was not made aware that she was leasing the machines from ILC rather than from CCC. She argues that she would not have signed the leases had she been told that she owed rent to ILC even if CCC failed to make the payments due to her.
 {¶ 13} The doctrine of unconscionability exists to prevent oppression and unfair surprise.[6] "Oppression" refers to burdensome or punitive terms of a contract, whereas "unfair surprise" refers to unconscionability in the formation of the contract, where one of the parties is overborne by superior bargaining power or is otherwise unfairly induced into entering into the contract.[7] Borda argues that the latter form of unconscionability was present in the case at bar.[8]
 {¶ 14} The record does not support Borda's contentions. The lease agreements clearly identified ILC as the lessor of the machines. By signing the leases, Borda acknowledged that she had read and understood all the terms and conditions contained therein, including the "unconditional obligation" clause already quoted in this decision. As we noted in GDR Investments, such "hell or high water" clauses are not per se unconscionable and are in fact authorized in finance leases under R.C. 1310.46.[9]
 {¶ 15} Borda also argues that ILC knew of CCC's financial difficulties and that it took advantage of Borda's ignorance of those difficulties in inducing Borda to enter into the lease agreements. We find no evidence in the record that, even had ILC been aware of CCC's difficulties, it had known that CCC did not intend to honor its agreement with Borda. Thus, we find no merit in Borda's argument that the lease agreements were unconscionable.[10]
 {¶ 16} Next, Borda contends that ILC and CCC engaged in a joint venture and that, therefore, any defense available against CCC should have been available against ILC. We find no merit in this argument. For there to be a joint venture, the parties involved in the venture must possess a common interest in the purpose of the undertaking and an equal right or authority to direct and govern each other's movements and conduct.[11] Here, ILC and CCC were separate entities, and there was no showing of such an agency relationship. The relationship among the parties in the instant case was substantially the same as that inChambers, where we rejected the argument that CCC had the general authority, real or apparent, to act for ILC.[12] We thus find no merit in Borda's argument concerning the existence of a joint venture.
 {¶ 17} Borda next argues that the leases should have been registered as investment contracts under federal and Ohio law. We disagree. An "investment contract" has been defined as "an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."[13]
More specifically, the funds of two or more investors must go into "a common pool from which all may benefit."[14] Further, a joint venture can qualify as a security where the investor is "entirely passive and * * * [has] invested in the joint ventures in reasonable reliance on the expected efforts and expertise of the [managers]."[15] It has also been stated that, for a joint-venture interest to qualify as a security, the investor must be "so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers."[16]
 {¶ 18} The lease agreements in the case at bar were not investment contracts. We first note that the existence of an investment contract presupposes that the parties involved were engaged in a joint venture, a proposition that we have already rejected in the instant case. Also, there was no evidence that the funds in the case at bar went into a "common pool" from which the investors were to benefit. Borda's lease payments went to ILC for the use of the ATMs that she selected from CCC. Borda's agreement with CCC, in turn, called for CCC to make monthly surcharge payments to her in the amount of $150 as her share of the revenues from customers' transactions on the ATMs. Such an arrangement simply did not fit the definition of an investment contract.
 {¶ 19} Additionally, Borda was not an entirely passive investor who relied upon the expertise of investment managers. Borda entered into the lease agreements in expectation that they would increase business at her delicatessens. Borda was thus an active participant in the plan in that she was to provide a place of business at which the ATMs would be located. Moreover, there was ample evidence in the record that Borda was an experienced businessperson who was capable of making rational decisions regarding the venture. We find no error in the trial court's holding that the ATM leases did not constitute investment contracts.
 {¶ 20} Borda next maintains that her transactions with ILC and CCC constituted a business opportunity plan under R.C. Chapter 1334, and that ILC was required to make certain disclosures about the plan under R.C.1334.02. Borda contends that ILC's failure to make those disclosures rendered the lease agreements subject to rescission and entitled her to damages.[17] Borda's contention is without merit.
 {¶ 21} A business opportunity plan is defined as an agreement in which a purchaser has the right to offer goods or services under three conditions: (1) the seller or affiliated person supplies the goods or services; (2) the purchaser makes an initial payment of greater than five hundred, but less than fifty thousand dollars; and (3) the seller represents that the purchaser will be provided accounts, outlets, or locations for the sale or distribution of the goods or services, that the purchaser can earn a profit in excess of the initial payment, that there is a market for the goods or services, or that there is a buy-back arrangement.[18]
 {¶ 22} While we have not specifically addressed the issue of whether ATM leases like those in the instant case constitute business opportunity plans, we have implicitly rejected the theory by consistently characterizing ATM contracts as finance leases. In doing so, we have emphasized that the lessor in these cases acts merely as a financer of the machines and does not act as a supplier of goods or services. As we stated in Chambers, [t]he sine qua non of a finance lease is that the finance lessor acts as the supplier of money and not as a merchant of goods."[19] For that reason, the lease agreements between Borda and ILC did not constitute a business opportunity plan.
 {¶ 23} In a similar vein, even if we were to assume that the arrangements among Borda, ILC, and CCC as a whole were covered under Chapter 1334, ILC would not have been responsible for making the disclosures under the statute. It is the "seller" of the plan that must make the disclosures under R.C. 1334.02, and a "seller" is defined as "a person who sells or leases a business opportunity plan."[20] Here, CCC was the entity that approached Borda with the plan to install ATMs in her stores, with ILC merely providing the financing. And although Borda argues that ILC was also a seller because the two companies were engaged in a joint venture, we have already rejected that argument. Accordingly, Borda was not entitled to rescission or damages under R.C. 1334.09.
 {¶ 24} Under her fifth and final issue for review, Borda contends that ILC's damages should have been zero. We have addressed the issue of damages under ILC's assignment of error, and for the reasons already stated, we hold Borda's argument to be without merit. Borda's assignment of error is overruled.
 {¶ 25} The judgment of the court of common pleas is affirmed in part and reversed in part, and this cause is remanded for a recalculation of ILC's damages in accordance with this decision and law.
Judgment accordingly.
Doan, P.J., and Painter, J., concur.
[1] 152 Ohio App.3d 715, 2003-Ohio-2670, 789 N.E.2d 1155.
[2] Id. at ¶ 61.
[3] Id.
[4] See id. at ¶ 62.
[5] Id. at ¶ 59.
[6] See Information Leasing Corp. v. GDR Investments, Inc.,152 Ohio App.3d 260, 2003-Ohio-1366, 787 N.E.2d 652, at ¶ 20.
[7] Id.
[8] She also argues that the damages provision of the contract was oppressive in that it did not require ILC to minimize damages. We have already discussed this issue under ILC's assignment of error, but we note that, under the circumstances of this case, the lease terms were not oppressive.
[9] See GDR Investments, supra, at ¶ 11.
[10] See Chambers, supra, at ¶ 81.
[11] Silver Oil Co., Inc. v. Limbach (1989), 44 Ohio St.3d 118, 123,541 N.E.2d 610.
[12] Chambers, supra, at ¶ 87.
[13] Stone v. Kirk (C.A. 6, 1993) 8 F.3d 1079, 1085, quoting UnitedStates Housing Foundation, Inc. v. Forman (1975), 421 U.S. 837, 852,95 S.Ct. 2051.
[14] Id., quoting Newmyer v. Philatelic Leasing, Ltd. (C.A. 6, 1975), 888 F.2d 385, 394.
[15] Id. at 1086, quoting Sec. and Exch. Comm. v. ProfessionalAssociates (C.A. 6, 1984), 731 F.2d 349, 357.
[16] Id., quoting Williamson v. Tucker (C.A. 5, 1981), 645 F.2d 404,424.
[17] See R.C. 1334.09.
[18] R.C. 1334.01(D)(1).
[19] Chambers, supra, at ¶ 31, quoting Schoenfield, Commercial Law: The Finance Lease under Article 2A of the Uniform Commercial Code (1989), 1989 Ann. Surv. Am. L. 565, 566.
[20] R.C. 1334.01(A).