JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiffs/appellants, Kenneth Koos and Jozef Debreczeni, appeal from the trial court's denial of their motion for default judgment and its granting of a motion for summary judgment filed by the defendants/appellees, Robert A. Adams, Kenneth E. Brown, and Berkshire Halifax Corporation, (also referred to as the "BH defendants"). After reviewing the record, and for the reasons set forth below, we affirm the decisions of the trial court.
 {¶ 2} In late 1997, Kenneth Koos and Jozef Debreczeni learned about an extremely lucrative investment program from mutual acquaintances, John Kobal, Kevin Parks, and Carl F. Gillombardo. The investment program was derived by Gene Storms, president of Pangaea Consortium, whom Kobal had met through business contacts. Koos, Debreczeni, Kobal, and Gillombardo met twice and discussed the details of Storms' proposed investment program. After the second meeting, Koos and Debreczeni decided to invest their money. Kobal contacted Storms by telephone so Koos could directly question him about his investment program. Satisfied with Storms' representations, Koos and Debreczeni entered into a contract with Storms and Pangaea Consortium.
 {¶ 3} Koos and Debreczeni agreed to separate co-venture contracts where both would wire transfer $175,000 to Pangaea Consortium plus an additional $2,500 to cover the business expenses of Gene Storms. The contracts stated that the $175,000 was half of the money needed to "lease" $10,000,000 dollars in cash, and that the investment would return a profit of $420,000 per month. The contract Koos signed allocated fifty percent of the profits to him and divided the remaining profit among Kobal, Gillombardo,[1] and Storms — each of the three received a sixteen-and-two-thirds percent share of the remaining profits. The co-venture contract that Debreczeni signed was very similar.
 {¶ 4} The record reveals that only Koos and Debreczeni provided the actual funds for the investment, even though the profits were allocated among many non-investors. Kobal and Gillombardo stated they received their shares as a "finder's fee." Storms received his share as payment for administering the investment program. The contract also stated that Pangaea Consortium would provide both Koos and Debreczeni a promissory note insuring their entire investment, in the event the investment program failed to yield profits. All of the above named parties signed the Pangaea co-venture contracts.
 {¶ 5} Unbeknownst to any of the investors,[2] Storms took the money provided by the plaintiffs and contacted Kenneth E. Brown and Robert A. Adams of Berkshire Halifax, a Delaware corporation. Kenneth Brown is the chief executive officer of Berkshire Halifax, and Robert Adams is the managing director. Berkshire Halifax is in the business of providing cash for investment grade bank notes of indebtedness.
 {¶ 6} Brown and Adams stated that Storms first contacted them in April or May 1998 seeking $10,000,000 for two investment grade bank notes that he had obtained. Storms stated the first bank note of indebtedness was in the face amount of $10,000,000 at six percent interest, and the second instrument of indebtedness was in the face amount of $80,000,000. Berkshire contracted with Storms and arranged for a "put" option contract to be issued from Clarion American Asset Management, Inc. in the amount of $10,000,000. A put option contract gives the owner the right, but not the obligation, to sell a specified amount of an underlying security at a specified price within a specified time. The put issuer agreed to purchase the two bank notes provided by Storms for $10,000,000. The put option was dated May 20, 1998 and would expire on June 5, 1998, unless the two bank notes were delivered to the put issuer by Storms. Storms never delivered the bank notes, and the put option expired.
 {¶ 7} The contract between Berkshire Halifax and Gene Storms/Pangaea Consortium provided that, in exchange for the preparation and delivery of the put option contract, Pangaea would pay Berkshire $400,000. It was agreed that $350,000 would be paid in cash and the remaining sum owed would be secured by a promissory note payable on demand by Pangaea for the remaining $50,000.
 {¶ 8} The contract provided that if Pangaea failed to exercise the put option or could not proceed with the transaction for any reason, Berkshire would retain the $400,000 for services rendered. Pangaea also agreed to hold Berkshire harmless and to defend it against any third-party claims. Storms/Pangaea warranted to Berkshire that the funds provided to Berkshire were solely its own property without reservation; Storms never disclosed to Berkshire that the $350,000 belonged to his investors or that he was acting on their behalf.
 {¶ 9} Storms/Pangaea also warranted to Berkshire that it was a sophisticated investor, exclusively and independently relying on the advice of its own legal, financial, and business counsel in entering into this transaction. Furthermore, Storms/Pangaea warranted that Berkshire did not provide any type of investment advice whatsoever, nor had they warranted any results or returns.
 {¶ 10} On July 24, 1998, more than a month after the put option had expired, Storms sent Koos and Debreczeni a note indicating that trading was ongoing, but they would receive no payment in July. The record reflects that Storms and Berkshire Halifax attempted a few other options for differing investments based on Storms' initial failure to deliver the original bank notes; however, all of these other dealings failed to bear profits.
 {¶ 11} On September 21, 2000, Koos and Debreczeni commenced the instant action against Gene Storms, Pangaea Consortium, Kenneth E. Brown, Robert A. Adams, and Berkshire Halifax Corporation, alleging fraud, misrepresentation, conversion, breach of fiduciary duty, and negligence. On October 30, 2000, Gene Storms filed an answer to the plaintiffs' complaint pro se.
 {¶ 12} On December 8, 2000, Robert Adams filed a motion to dismiss the plaintiffs' complaint for lack of personal jurisdiction, utilizing the services of an attorney who was licensed to practice law in the state of Florida. On December 11, 2000, Kenneth Brown and Berkshire Halifax, utilizing the services of the same Florida attorney, also filed their motion to dismiss based on the same jurisdictional grounds. On the same day, the plaintiffs filed a motion for default judgment against the BH defendants alleging that they failed to answer the complaint within 28 days.
 {¶ 13} On December 15, 2000, the plaintiffs filed a motion to strike both of the BH defendants' motions to dismiss claiming the attorney representing them in the instant action was not properly licensed to practice law in the state of Ohio. On January 11, 2001, the trial court granted the plaintiffs' motion to strike the BH defendants' motions to dismiss holding the BH defendants' attorney was not licensed to practice law in the state of Ohio, nor had he been admitted pro hac vice. The trial court gave the BH defendants until January 31st to file their answer or it would hold a hearing on the plaintiffs' motion for default judgment.
 {¶ 14} On January 22, 2001, the BH defendants obtained new trial counsel licensed to practice law in the state of Ohio. On January 30, 2001, the plaintiffs filed a supplement to their motion for default judgment against the BH defendants. On January 31, 2001, the BH defendants refiled their motion to dismiss the plaintiffs' complaint based on a lack of personal jurisdiction and insufficiency of service of process.
 {¶ 15} On May 7, 2001, the BH defendants filed for leave to file a responsive pleading out of rule in response to the plaintiffs' motion for default judgment alleging their initial pleadings were untimely due to excusable neglect; the motion for leave was granted by the trial court. On November 30, 2001, the trial court held that the BH defendants had shown excusable neglect in failing to answer the complaint and denied the plaintiffs' motion for default judgment.
 {¶ 16} On February 7, 2003, the trial court denied the BH defendants' motion to dismiss finding that the plaintiffs' complaint was served properly and that the defendants have sufficient ties with the state of Ohio for the court to exercise personal jurisdiction. On February 28, 2003, the BH defendants filed their answer and also cross claims against Gene Storms and Pangaea Consortium. On November 5, 2003, the plaintiffs filed a motion for default judgment against Pangaea Consortium for failure to answer the complaint.
 {¶ 17} On November 19, 2003, the BH defendants filed a motion for summary judgment. On the same day, the plaintiffs filed a motion for partial summary judgment against Gene Storms. On December 3, 2003, the plaintiffs filed their motion in opposition to the BH defendants' motion for summary judgment.
 {¶ 18} On February 12, 2004, the trial court granted the plaintiffs' motion for partial summary judgment against Gene Storms based on his agreement to pay the two promissory notes totaling $177,500 each. On the same day, the trial court also granted summary judgment in favor of the BH defendants holding that they are entitled to judgment as a matter of law because the plaintiffs have failed to prove fraud, conversion, breach of fiduciary duty, or negligence. The trial court ordered that the case proceed to trial against Gene Storms and that a default judgment hearing be held concerning Pangaea Consortium.
 {¶ 19} On February 23, 2004, Gene Storms and Pangaea Consortium, by an agreed judgment entry, settled the case and agreed to pay $200,000 to each of the plaintiffs. On February 24, 2004, the BH defendants dismissed their cross claims against Gene Storms and Pangaea Consortium. The plaintiffs, hereinafter the "appellants," bring this timely appeal and present two assignments of error for review.
 {¶ 20} "I. The trial court erred when it denied Plaintiffs' motions for default judgment against the BH Defendants."
 {¶ 21} In their first assignment of error, the appellants claim the trial court erred by not granting their motion for default judgment when the appellees filed their initial pleadings four and seven days late and without first requesting leave from the court. Furthermore, the appellants claim the trial court erred when it held the appellees had shown excusable neglect, pursuant to Civ.R. 6(B), when denying their motion for default judgment.
 {¶ 22} Although Civ.R. 12(A)(1) provides that, generally, a defendant must answer within twenty-eight days after service of the summons and complaint, Civ.R. 6(B)(2) provides that when by these rules * * * an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion * * * upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect. The determination of whether neglect was excusable or inexcusable must of necessity take into consideration all the surrounding facts and circumstances. Griffey v. Rajan (1987),33 Ohio St.3d 75, 79, 514 N.E.2d 1122, 1126. Excusable neglect has been found where defendants' failure to file an answer was entirely attributable to their prior counsel's neglect and they subsequently retained new counsel. Pope v. Holloman (Oct. 29, 1987), Cuyahoga App. No. 52877.
 {¶ 23} It is preferred that cases be decided on their merits rather than on technicalities. Perotti v. Ferguson (1983)7 Ohio St.3d 1, 3. The trial court's decision to permit a tardy filing will not be disturbed on appeal absent an abuse of discretion. State ex rel. Lindenschmidt v. Butler Cty. Bd. ofCommrs. (1995), 72 Ohio St.3d 464, 465, 650 N.E.2d 1343.
 {¶ 24} To constitute an abuse of discretion, the ruling must be more than legal error; it must be unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217. "The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations." State v. Jenkins (1984),15 Ohio St.3d 164, 222, quoting Spalding v. Spalding (1959),355 Mich. 382, 384-385. In order to have an abuse of that choice, the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias. Nakoffv. Fairview General Hospital (1996), 75 Ohio St.3d 254.
 {¶ 25} In the instant matter, the appellants claim that they perfected service of process on the appellees on November 6, 2000; therefore, according to Civ.R. 12(A), the appellees' answer or responsive pleading would have to be filed with the trial court by December 4th. The appellees retained counsel in their home state of Florida and had counsel file motions to dismiss on December 8th and December 11th; four and seven days past the filing deadline. On December 11th, the appellants filed a motion for default judgment.
 {¶ 26} In their motions to dismiss, the appellees claimed the trial court lacked personal jurisdiction over them and further claimed that service of process was not properly obtained. On December 15, 2000, the appellants filed a motion to strike both of appellees' motions to dismiss arguing the motions were filed by an attorney not licenced to practice law in the state of Ohio. On January 11, 2001, the trial court granted the appellants' motion to strike and held that the appellees had until January 31, 2001 to file an answer or the trial court would hold a hearing on the appellants' motion for default judgment.
 {¶ 27} The appellees then obtained the services of an attorney licensed to practice law in the state of Ohio and refiled a joint motion to dismiss on January 31, 2001. On May 7, 2001, the appellees filed a motion for leave to file a brief in opposition to the appellants' motion for default judgment. On November 30, 2001, the trial court granted the appellees' motion for leave and subsequently denied the appellants' motion for default judgment, holding that the appellees had shown excusable neglect when filing their motion to dismiss past the pleading date. The trial court also stated that, given the facts and circumstances surrounding the case, it should be decided on its merits.
 {¶ 28} The appellees filed their motions to dismiss only four and seven days after the responsive pleading was due. A question was raised in the appellees' motion to dismiss as to whether service of process was actually perfected by the appellants; therefore, the trial court could have construed that the date the responsive pleading was due may have been later than December 4. After striking their first motions to dismiss due to unlicensed counsel, the trial court specifically allowed the appellees until January 31, 2001 in order to file another responsive pleading before it would hold a default hearing; in effect, and contrary to the appellants' contentions, the trial court implicitly granted leave for the appellees to file another pleading.
 {¶ 29} Also contrary to the appellants' assertions, the instant matter is distinguishable from the facts in Miller v.Lint (1980), 62 Ohio St.2d 209, 213-214, 404 N.E.2d 752, andDavis v. Immediate Medical Services, Inc., (1997),80 Ohio St.3d 10, 10, 684 N.E.2d 292, where defendants filed their answers at least thirty days late, only after a motion for default judgment had been filed, and without a showing that the untimeliness of the answer was due to excusable neglect.
 {¶ 30} Moreover, the appellees were poorly represented by counsel from Florida, who filed their motions to dismiss late, all the while knowing he lacked the actual authority to do so; Florida counsel was not admitted to practice law in the state of Ohio, nor had he been admitted pro hac vice. The appellees relied on their Florida counsel to properly retain Ohio counsel and answer the appellants' complaint. After their motions had been struck by the trial court, appellees hired new Ohio counsel and fired their Florida counsel. Thereafter, the appellees requested leave to answer the appellants' motion for default judgment claiming their untimeliness was due to insufficient service of process and ineffective representation.
 {¶ 31} Given the facts and circumstances surrounding this case, we find that the trial court did not abuse its discretion in denying the appellants' motion for default judgment and finding the appellees had demonstrated excusable neglect. The appellees' failure to timely respond to the complaint was neither willful nor with complete disregard to the Ohio Rules of Civil Procedure. The appellants' first assignment of error is hereby overruled.
 {¶ 32} "II. The trial court erred when it entered summary judgment against plaintiffs in favor of the BH Defendants."
 {¶ 33} In their second assignment of error, the appellants argue the trial court erred in granting summary judgment in favor of the appellees concerning the appellants' claims for fraud, conversion, breach of fiduciary duty, and negligence. The appellants contend there is a genuine issue of material fact as to whether Gene Storms and Pangaea Consortium were acting as agents for the appellees, which would in turn give rise to all the aforementioned causes of action.
 {¶ 34} "Civ.R. 56(C) specifically provides that before summary judgment may be granted, it must be determined that: (1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come but to one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317,327.
 {¶ 35} It is well established that the party seeking summary judgment bears the burden of demonstrating that no issues of material fact exist for trial. Celotex Corp. v. Catrett (1987),477 U.S. 317, 330; Mitseff v. Wheeler (1988),38 Ohio St.3d 112, 115. Doubts must be resolved in favor of the nonmoving party. Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356.
 {¶ 36} In Dresher v. Burt (1996), 75 Ohio St.3d 280, the Ohio Supreme Court modified and/or clarified the summary judgment standard as applied in Wing v. Anchor Medina, Ltd. of Texas
(1991), 59 Ohio St.3d 108. Under Dresher, "* * * the moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying thoseportions of the record which demonstrate the absence of a genuineissue of fact or material element of the nonmoving party'sclaim." Id. at 296; (emphasis in original). The nonmoving party has a reciprocal burden of specificity and cannot rest on mere allegations or denials in the pleadings. Id. at 293. The nonmoving party must set forth "specific facts" by the means listed in Civ.R. 56(C) showing a genuine issue for trial exists. Id.
 {¶ 37} This court reviews the lower court's granting of summary judgment de novo. Brown v. Scioto Bd. of Commrs.
(1993), 87 Ohio App.3d 704. An appellate court reviewing the grant of summary judgment must follow the standards set forth in Civ.R. 56(C). "The reviewing court evaluates the record * * * in a light most favorable to the nonmoving party * * *. [T]he motion must be overruled if reasonable minds could find for the party opposing the motion." Saunders v. McFaul (1990),71 Ohio App.3d 46,50;Link v. Leadworks Corp. (1992), 79 Ohio App.3d 735,741.
 {¶ 38} A finding of agency by apparent authority or agency by estoppel must be based upon words or conduct by the principal. * * * The assurances of one who assumes to act as an agent of his authority to bind another are not, standing alone, sufficient to prove his agency. The putative agent cannot create apparent agency alone. Info. Leasing Corp. v. Chambers (2003),152 Ohio App.3d 715, 740, 789 N.E.2d 1155.
 {¶ 39} "In order for a principal to be bound by the acts of his agent under the theory of apparent agency, evidence must affirmatively show: (1) that the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of those facts and acting in good faith had reason to believe that the agent possessed the necessary authority."Master Consol. Corp. v. BancOhio Nat'l Bank (1991),61 Ohio St.3d 570, 575 N.E.2d 817, syllabus.
 {¶ 40} A person claiming or asserting the existence of an agency relationship has the burden of proving the existence and extent of the agency. Irving Leasing Corp. v. M H Tire Co.
(1984), 16 Ohio App.3d 191, 195, 16 Ohio B. 205, 475 N.E.2d 127. There must be corroborating evidence beyond the mere assertion of an agency relationship. Toms v. Delta Sav. Loan Assn. (1955),162 Ohio St. 513, 124 N.E.2d 123. Therefore, we must determine whether the appellants demonstrated that the appellees held Storms or Pangaea Consortium out to the public as having the authority to enter into investment ventures or to solicit/collect funds on their behalf.
 {¶ 41} Appellant Koos testified to the following facts in an affidavit: (1) Storms told him that he routinely worked closely with Berkshire Halifax; (2) Storms routinely discussed his investment with Ken Brown, chief executor officer of Berkshire Halifax; (3) Storms worked exclusively with Berkshire Halifax and would frequently use the pronoun "we" when referring to his work with Berkshire; and (5) Berkshire Halifax never stated to Koos that Storms was not its agent.
 {¶ 42} Appellant Debreczeni stated that he did not know about Berkshire Halifax and invested in Storms' program based on the representations made by John Kobal. Kobal stated in his deposition that he did not know about the Berkshire Halifax involvement because Storms kept his "program managers" and business contacts secret. Kobal believed that Storms was handling the entire investment program.
 {¶ 43} The appellees stated in their depositions that Gene Storms approached them looking to lease $10,000,000 to buy two investment grade bank notes worth $90,000,000. The appellees further stated that they provided no investment advice and only fronted investors' money for a fee. This fact was confirmed in the contract that was ratified between Storms/Pangaea and Berkshire Halifax. The appellees also stated that Gene Storms made representations to them that the $400,000 investment money to initiate the "put option contract" belonged solely to him and Pangaea. The appellees stated they did not learn about the appellants until the deals Storms put together had fallen apart.
 {¶ 44} The contract between Berkshire Halifax and Gene Storms is very specific. In exchange for $400,000, Berkshire Halifax will cause a put option contract to issue in the name of Pangaea Consortium in exchange for two bank notes worth $90,000,000, which were to be provided by Storms. Attached to the appellees' motion for summary judgment is a put option contract issued from Clarion American Asset Management, Inc. in the amount of $10,000,000 agreeing to purchase Storms' bank notes. The option contract was never executed because Storms failed to deliver the promised bank notes. Pursuant to the terms of the contract, Berkshire Halifax retained the $400,000 as payment for services rendered,[3] even though the put option was not exercised.
 {¶ 45} The record further reflects that Koos has a masters degree in business administration, and Debreczeni has a doctorate degree, is a certified public accountant, and is a professor of finance and economics at the University of Akron. Both appellants failed to research the investment program and took Gene Storms at his word that it would produce profits. Neither appellant asked Storms for a prospectus on the program nor did they research Storms, his company, or his ability to pay the promissory notes guaranteeing their investment.
 {¶ 46} Based the facts in this case, taken in the light most favorable to the appellants, we find the appellants failed to establish an agency relationship between Storms/Pangaea and Berkshire Halifax. The appellants admit in their depositions that all representations and guarantees about the investment program came solely from Gene Storms. The co-venture contracts entered into between the appellants and Storms/Pangaea did not mention Berkshire Halifax, nor did the contract entered into between Berkshire Halifax and Storms/Pangaea mention the appellants. The affidavit sworn to by appellant Koos only alleges that Storms claimed he was an agent for Berkshire Halifax. An agency by estoppel must be based upon words or conduct by the principal; the assurances of one who assumes to act as an agent of his authority to bind another are not, standing alone, sufficient to prove his agency. No evidence was produced in the record that Berkshire Halifax held Storms out to the public to be its agent.
 {¶ 47} Furthermore, we find the appellants' argument that the appellees "ratified" and accepted the representations and guarantees of Storms/Pangaea when they accepted the appellants' $350,000 investment from Storms to be without merit. Ratification by a principal cannot occur unless that principal has full knowledge and understanding of the acts performed by the agent.Testa v. Roberts (1988), 44 Ohio App.3d 161, 542 N.E.2d 654. Evidence exists in the record that Berkshire Halifax did not know about the appellants being the actual investors until long after the put option purchased by Storms had expired.
 {¶ 48} Looking past the agency relationship, there is evidence in the record that proves that Berkshire Halifax fulfilled its contractual obligations and secured a put option contract for $10,000,000. It was Storms who failed to consummate the deal and deliver the promised bank notes. In light of this evidence and without proof that Berkshire Halifax made any representations or guarantees to the appellants about the investment program, the appellants cannot prove their claims of fraud, conversion, breach of fiduciary duty, or negligence against the appellees. Moreover, the most important player in this investment program, Gene Storms, "the middle man," was never deposed by the appellants. His testimony would have been invaluable regarding his relationship with the appellees and their subsequent business dealings.
 {¶ 49} The appellants' second assignment of error is hereby overruled.
 {¶ 50} Judgment affirmed.
It is ordered that appellees recover of appellants costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Corrigan, A.J., and Sweeney, J., Concur.
[1] Gillombardo and Kevin Parks shared a sixteen-and-two-thirds percent share of the profits.
[2] Appellant Koos stated in an affidavit that he knew that Gene Storms was going to invest his money with Berkshire Halifax.
[3] It is apparent from the deposition testimony of the appellees that they tried several other subsequent deals with Gene Storms working off the same $400,000 fee paid for the first option contract. All subsequent deals failed to come to fruition or yield profits.