[Cite as *Enduring Wellness, L.L.C. v. Roizen*, 2020-Ohio-3180.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

ENDURING WELLNESS, L.L.C.,  :

    Plaintiff-Appellant,  :

                                 No. 108681

    v.  :

MICHAEL F. ROIZEN, M.D., ET AL.,  :

    Defendants-Appellees.  :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED
**RELEASED AND JOURNALIZED:**  June 4, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-19-909042

---

***Appearances:***

Seeley, Savidge, Ebert & Gourash Co., L.P.A., Jeffrey S. Moeller, and Daniel F. Gourash, *for appellant.*

Hahn, Loeser, & Parks, L.L.P., Robert J. Fogarty, E. Sean Medina, and David M. Hopkins, *for appellees.*

MARY EILEEN KILBANE, J.:

{¶ 1} Plaintiff-appellant, Enduring Wellness, L.L.C. ("EW"), appeals from the order of the trial court that dismissed all five counts alleged in its complaint against defendants-appellees, Michael R. Roizen, M.D. ("Roizen") and Cleveland

Clinic Wellness Enterprise, L.L.C. ("CCWE") under Civ.R. 12(B)(6) for failing to state a claim upon which relief can be granted.

{¶ 2} For the reasons that follow, we affirm the trial court.

## I. Factual Background

{¶ 3} The facts as alleged in the complaint and documents attached to it are as follows.

### A. The Licensing Agreement

{¶ 4} On June 17, 2015, CCWE, a subsidiary of the Cleveland Clinic Foundation ("CCF"), entered into a "Non-Exclusive Strategic Alliance Agreement Related To Manufacturing And Distribution Of Certain Products" ("Licensing Agreement") with a company called Balance Product Development, Inc. On December 21, 2015, the Licensing Agreement was assigned from Balance Product Development, Inc. to EW with CCWE's written consent.

{¶ 5} The Licensing Agreement is signed by Tom Gubanc ("Gubanc") on behalf of CCF. Gubanc is a Senior Director of CCWE. Roizen is not party to the contract. The Licensing Agreement set forth terms for the development, marketing, and sale of wellness products — here, pillows — that would be marketed as approved by CCWE. CCWE was to receive a percentage-based royalty on sales in exchange for its licensed approval branding.

### B. Roizen

{¶ 6} According to the complaint, Roizen is the Chief Wellness Officer of CCWE. He was "involved in developing, testing and approving Enduring Wellness'

pillows" and "held himself out as having actual authority to act on behalf of CCWE in administering the Licensing Agreement, and CCWE allowed him to so hold himself out."

## C.  EW's Pillows

{¶ 7}  Between 2015 and 2016, EW incurred expenses in the course of manufacturing, marketing, obtaining necessary approvals for, and making ready to sell a line of pillows branded as CCWE-approved.

{¶ 8}  CCWE and Roizen reviewed and approved samples of the pillows to be marketed and sold with CCWE's approved branding.  In November 2016, CCWE approved packaging for the pillows.  The complaint does not expressly allege that EW received approval from CCWE in writing, but states that EW obtained all necessary approvals.

## D.  The Aeroscena Sublicense

{¶ 9}  Around May 2016, Roizen and Gubanc, Senior Director of CCWE, together approached EW with a proposal by which EW would sublicense the CCWE approval to a business called Aeroscena, L.L.C. ("Aeroscena"), which owned a brand of aromatic oils.  Roizen was an equity owner in Aeroscena, but EW did not know that at this time.  EW declined to sublicense Aeroscena after it was advised that CCWE would separately license Aeroscena.  The complaint does not clarify who initially advised EW that CCWE would separately license Aeroscena rather than authorize a sublicense.  What is clear is that EW initially declined to sublicense Aeroscena after learning that it did not have CCWE's approval to do so.

{¶ 10} Close to a year later, around January 2017, Roizen advised EW that Aeroscena would not be licensed directly by CCWE, but instead would be sublicensed through EW.  Relying on Roizen's actual or apparent authority to act on behalf of CCWE, EW began negotiating a sublicense with Aeroscena.  EW relied on Roizen's approval of the sublicense even though it knew CCWE had refused to allow EW to grant Aeroscena a sublicense several months earlier.

{¶ 11} Roizen also advised around this time that a "summary in-house review of the pillows might be needed."  This claim was "contrary to all prior approvals and assurances from both him, as CCWE's actual or apparent agent, and others at CCWE."  Roizen also stated that Aeroscena wanted to attend a trade show in Las Vegas in March 2017, and indicated a "need for haste."

### E.     The Las Vegas Trade Show

{¶ 12} EW and Aeroscena shared booth space at a Las Vegas trade show in March 2017, during negotiations for the sublicense that CCWE initially refused to grant.  Roizen attended the trade show where he marketed a book he authored and also marketed Aeroscena's essential oils, which were displayed as though they branded as CCWE-approved.

### F.     Contract Termination

{¶ 13} Two days after the Las Vegas trade show, CCWE "purported to terminate Enduring Wellness' Licensing Agreement."  Around this time, EW learned that Roizen was an equity owner in Aeroscena.

### G. The QVC Launch Show

{¶ 14} The pillows were scheduled for a test-marketing product launch on QVC on or around June 21, 2017, for EW's pillows. CCWE and Roizen were aware of the QVC launch and the expenses EW incurred in preparing for it. CCWE prepared another doctor, Dr. Bang, to appear on QVC for the launch show while wearing CCWE logo gear.

{¶ 15} The QVC launch show took place about three months after CCWE had terminated the Licensing Agreement. The pillows were still marketed during the scheduled test launch on QVC, but without the CCWE-approved branding and at a lower price. The test launch was not rebroadcast. It appears from the complaint that no pillow sales occurred before the QVC launch show in June 2017.

{¶ 16} Afterwards, EW lost other contracts related to the pillows and incurred approximately $450,000 in costs related to research, development, and marketing of the pillows.

## II.  Procedural Background

{¶ 17} On January 2, 2019, EW filed its complaint. It raised three claims against Roizen: (1) tortious interference with contract; (2) fraud; and (3) deceptive trade practices under R.C. 4165.02 and R.C. 4165.03 (Counts 1-3). It raised two claims against CCWE: (1) breach of contract and (2) liability for acts of agent with apparent authority/agency by estoppel (Counts 4 and 5).

{¶ 18} On April 4, 2019, Roizen and CCWE filed a Civ.R. 12(B)(6) motion to dismiss the complaint for failure to state a claim upon which relief may be granted.

On April 16, 2019, EW opposed the motion to dismiss, and the defendants-appellants filed a reply to EW's opposition on May 14, 2019.

{¶ 19} The trial court held a hearing on the motion to dismiss on May 22, 2019. It granted the motion to dismiss on June 6, 2019, on the grounds that EW failed to state a claim upon which relief could be granted. This appeal followed.

{¶ 20} EW has assigned one error for review:

<u>Assignment of Error No. 1</u>

The trial court erred by dismissing the complaint for failure to state a claim under Ohio R. Civ. P. 12(B)(6); [e]ach and every count of the complaint stated a claim upon which relief could be granted, construing the facts most favorably to plaintiff.

## III.   Standard of Review

{¶ 21} This court applies a de novo standard of review of a trial court's ruling on a Civ.R. 12(B)(6) motion to dismiss. *Perrysburg Twp. v. Rossford*, 103 Ohio St.3d 79, 2004-Ohio-4362, 814 N.E.2d 44, ¶ 5, citing *Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St.3d 416, 2002-Ohio-2480, 768 N.E.2d 1136. A trial court may grant a motion to dismiss for failure to state a claim upon which relief can be granted where it appears "beyond doubt from the complaint that the plaintiff can prove no set of facts entitling [him] to relief." *Thompson v. Cuyahoga Cty. Clerk of Courts*, 8th Dist. Cuyahoga No. 108806, 2020-Ohio-382, ¶ 7-8, quoting *Grey v. Walgreen Co.*, 197 Ohio App.3d 418, 2011-Ohio-6167, 967 N.E.2d 1249, ¶ 3 (8th Dist.).

{¶ 22} In construing a complaint upon a motion to dismiss for failure to state a claim, we must presume that all factual allegations of the complaint are true

and make all reasonable inferences in favor of the nonmoving party. *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192, 532 N.E.2d 753 (1988). "Under these rules, a plaintiff is not required to prove his or her case at the pleading stage. * * * Consequently, as long as there is a set of facts, consistent with the plaintiff's complaint, which would allow the plaintiff to recover, the court may not grant a defendant's motion to dismiss." *Schmitz v. NCAA*, 2016-Ohio-8041, 67 N.E.3d 852, ¶ 9 (8th Dist.), quoting *York v. Ohio State Hwy. Patrol*, 60 Ohio St.3d 143, 144-145, 573 N.E.2d 1063 (1991).

{¶ 23} "Under Ohio's liberal pleading rules, all that is required of a plaintiff bringing suit is (1) a short and plain statement of the claim showing that the party is entitled to relief, and (2) a demand for judgment for the relief to which the party claims to be entitled. Unlike other claims, however, fraud claims must be plead with particularity as required under Civ.R. 9(B)." (Citations omitted). *Hammon v. Huntington Natl. Bank*, 2018-Ohio-87, 102 N.E.3d 1248, ¶ 58-59 (8th Dist.).

{¶ 24} However, even under Ohio's notice-pleading standard, a cause of action must be factually supported and courts need not accept bare assertions of legal conclusions. *Tuleta v. Med. Mut. of Ohio*, 2014-Ohio-396, 6 N.E.3d 106, ¶ 28 (8th Dist.). "[B]are legal conclusions are not considered admitted and are not sufficient to withstand a motion to dismiss." *Harper v. Weltman, Weinberg & Reis Co., L.P.A.*, 8th Dist. Cuyahoga No. 107439, 2019-Ohio-3093, ¶ 33.

{¶ 25} Where a contract governs the parties' rights, "[d]ismissals under Civ.R. 12(B)(6) are proper where the language of the writing is clear and

unambiguous." *Abdallah v. Doctor's Assocs.*, 8th Dist. Cuyahoga No. 89157, 2007-Ohio-6065, ¶ 3, quoting *Fairview Realty Investors v. Seaair, Inc.,* 8th Dist. Cuyahoga No. 81296, 2002-Ohio-6819. "A motion to dismiss should be granted 'only where the allegations in the complaint show the court to a certainty that the plaintiff can prove no set of facts upon which he might recover,' or, in the case of a complaint seeking relief under a contract attached pursuant to Civ.R. 10(D), where the 'writing presents an insuperable bar to relief.'" *Id.*

## IV. Law and Analysis

### A. EW's Claims Against Roizen

#### 1. Tortious Interference with Contract Against Roizen

{¶ 26} In its tortious interference claim, EW alleges that Roizen took actions to undermine the Licensing Agreement that existed between EW and CCWE by "tricking [EW] into negotiating a sublicense agreement and providing other marketing support for his Aeroscena, LLC aromatic oils company, which he knew would create a conflict of interest and/or circumvent CCWE's refusal to give Aeroscena" a branding license. EW alleges that Roizen had no legal privilege for his actions and that his actions caused CCWE to terminate the Licensing Agreement, which caused EW to incur damages.

{¶ 27} "The elements of tortious interference with a contract are: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) lack of justification; and (5) resulting damages." *Berardi's Fresh Roast, Inc. v. PMD*

*Ents.*, 8th Dist. Cuyahoga No. 90822, 2008-Ohio-5470, ¶ 35, citing *Fred Siegel Co. v. Arter & Hadden*, 85 Ohio St.3d 171, 707 N.E.2d 853 (1999).

{¶ 28} According to the Ohio Supreme Court, "intentional procurement of the contract's breach," not the breach itself, is an element of tortious interference with contract. *Fred Siegel Co. v. Arter & Hadden*, 85 Ohio St.3d 171, 176, 707 N.E.2d 853 (1999). However, there is case law to support that a breach of contract is an implied element of tortious interference with contract, because there must be a breach of contract for a defendant to procure such a breach. *See Cairelli v. Brunner*, 10th Dist. Franklin No. 18 AP 000164, 2019-Ohio-1511, ¶ 58 ("Without a breach of contract there can be no tortious interference with contract."); *Sony Elec. v. Grass Valley Group*, 1st Dist. Hamilton Nos. C-010133 and C-010423, 2002 Ohio App. LEXIS 1304, 13 (Mar. 22, 2002) ("[A] tortious interference with a contract requires that there be a breach of contract."); *Pannozzo v. Anthem Blue Cross & Blue Shield*, 152 Ohio App.3d 235, 2003-Ohio-1601, 787 N.E.2d 91, ¶ 19 (7th Dist.) ("for [plaintiff's] claim of tortious interference to survive there must first be a breach of the contract between himself and [defendant]"). Because we determine below that EW has failed to state a cause of action for breach of contract, we affirm the trial court's dismissal of its tortious interference claim.

{¶ 29} Further, even assuming a breach occurred, the complaint fails to allege that Roizen intentionally procured the contract's breach. Roizen sought to use the Licensing Agreement between EW and CCWE to secure a sublicense for Aeroscena. Accordingly, even construing all the allegations in EW's favor, the

complaint indicates that Roizen would have wanted to preserve the Licensing Agreement, not intentionally procure its breach.

### 2. Fraud against Roizen

{¶ 30} In its fraud claim, EW alleges that Roizen falsely represented or concealed the truth where he had a duty to disclose that (1) he had authority to approve EW's pillows for sale with CCWE-approval branding; (2) that the pillows were approved by CCWE; and (3) that he had permission from CCWE to include Aeroscena products with EW's marketing efforts for its own products, including at the Las Vegas trade show in March 2017. EW alleges it relied on Roizen's representations in agreeing to negotiate a sublicense with Aeroscena and share a booth with it at the Las Vegas trade show that allegedly led to CCWE terminating the Licensing Agreement. EW also alleges it relied on Roizen's representations in deciding to incur costs to market, manufacture, and sell its pillows on QVC.

{¶ 31} "The elements of fraud are: (1) a representation of fact (or where there is a duty to disclose, concealment of a fact); (2) that is material to the transaction at issue; (3) made falsely, with knowledge of its falsity or with utter disregard and recklessness as to whether it is true or false; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the misrepresentation (or concealment) and (6) resulting injury proximately caused by the reliance." *Mobley v. James*, 8th Dist. Cuyahoga No. 108470, 2020-Ohio-380, ¶ 32, citing *Cohen v. Lamko, Inc.*, 10 Ohio St.3d 167, 169, 462 N.E.2d 407 (1984).

{¶ 32} CCWE argues that EW cannot adequately allege that it relied on Dr. Roizen's oral statements. We agree that EW's fraud claim fails on the element of justifiable reliance. Before we address why EW's claim fails for lack of justifiable reliance, we resolve EW's concern that discussing justifiable reliance requires us to improperly look beyond the pleadings.

{¶ 33} To bolster its argument that EW could not have justifiably relied on any oral statements regarding approval, CCWE stated that EW did not receive written approval for the pillows. EW contends that CCWE's statement is outside the scope of the complaint because it contradicts EW's allegation that it obtained the necessary approvals for the pillows and that CCWE and Roizen reviewed and approved samples of the pillows. We agree with EW that CCWE's argument regarding a lack of written approval is beyond the scope of the complaint and may not be considered in our review of the trial court's dismissal of the complaint. However, we need not rely on nor consider CCWE's statement to find that EW's fraud claim fails for lack of justifiable reliance. Even accepting as true that the pillows were approved in writing, we nevertheless find that EW failed to state a claim for fraud.

{¶ 34} EW also challenges CCWE's argument that EW could not have reasonably relied on Roizen's misrepresentations because the Licensing Agreement required all approvals to be in writing. EW contends that the question of reasonableness required for a justifiable reliance determination is a fact question beyond the scope of the complaint. We disagree. In *Hoffman v. Fraser*,

11th Dist. Geauga No. 2010-G-2975, 2011-Ohio-2200, the Eleventh District relied on the written instrument attached to the complaint to affirm the trial court's dismissal of the plaintiff's claim for failing to sufficiently allege justifiable reliance. In *Hoffman*, a commitment for title insurance attached to the complaint stated that there could be no justifiable reliance on the title search unless the appellant purchased a title insurance policy, and the appellant did not purchase such a policy. *Id.* at ¶ 17. The Eleventh District held that the disclaimer precluded any claim of justifiable reliance. *Id.* at ¶ 17. Likewise, we reject EW's argument that we may not consider the issue of justifiable reliance on a motion to dismiss. As we explain below, the Licensing Agreement's requirement that all approvals be in writing prevents EW from successfully alleging that it justifiably relied on Roizen's alleged misstatements.

{¶ 35} In determining whether there was justifiable reliance, one looks to the relationship between the parties. *Mussivand v. David*, 45 Ohio St. 3d 314, 322, 544 N.E.2d 265 (1989). The Licensing Agreement governs the relationship between CCWE and EW, including CCWE's approval of the pillows or other licensed products. It is undisputed that Roizen is not party to the Licensing Agreement and we find that EW has failed to allege any facts to support that Roizen had any authority to grant approval related to the pillows or Aeroscena sublicense. Having reviewed each alleged misrepresentation, there is no set of facts that would show EW justifiably relied on any of the alleged misrepresentations.

{¶ 36} Regarding the first alleged misrepresentation, EW cannot prove it justifiably relied on Roizen's alleged misstatement that he had authority to approve EW's pillows for sale with CCWE-approval branding. The Licensing Agreement contains multiple provisions that require EW to obtain approval from CCWE in writing. As a result, there is no way EW could prove it justifiably relied on Roizen's representation. Section 3 of the Licensing Agreement provides: "Company [EW] shall perform all of the following duties and obligations *at the discretion and written direction of CCWE.*" (Emphasis added.) Subsection 3.7 provides that EW shall "Develop products relating to the manufacture and sale of the Licensed Products which shall be *subject to the express written approval of CCWE.*" (Emphasis added.) Similarly, subsection 3.9 provides, in part:

> CCWE retains the right to grant final, or interim when specifically requested, approval on art, design and editorial matters. Company agrees to submit to CCWE, for final approval, drafts, prototypes, and finished samples of all Licensed Products and any and all advertising promotional and packaging material related to said Licensed Products. *CCWE will respond in writing to Company regarding approval*, disapproval, or still under review within ten (10) business days after receipt of such samples.

(Emphasis added.)

{¶ 37} Nowhere does the Licensing Agreement state or indicate that Roizen had authority to approve the pillows. Rather, it plainly required EW to obtain written approval from CCWE in regards to the manufacture, marketing, and sale of the pillows. Thus, EW cannot show that it justifiably relied on Roizen's alleged statement that he had authority to approve the pillows.

{¶ 38} Moving to the second alleged misrepresentation, EW also cannot prove it justifiably relied on Roizen's alleged misstatement that CCWE approved the pillows. First, taking as true EW's allegation that it obtained all necessary approvals for the pillows from CCWE, Roizen's statement that the pillows were approved is not false and therefore cannot sustain a fraud claim. Otherwise, for the reasons already discussed, EW cannot prove that it justifiably relied on this alleged misstatement where the Licensing Agreement, to which Roizen was not a party, governed the approval process and required approval in writing.

{¶ 39} Finally, EW also cannot prove it justifiably relied on Roizen's alleged misstatement that he had authority to approve the Aeroscena sublicense. EW alleges that it reasonably believed Roizen had the authority "to act in this fashion on behalf of CCWE" and therefore agreed to negotiate a sublicense with Aeroscena and agreed to share space with Aeroscena at the Las Vegas trade show. However, both the Licensing Agreement and facts alleged show to a certainty that EW cannot prove its alleged reliance was justified.

{¶ 40} The Licensing Agreement prohibits EW from granting a sublicense without CCWE's prior written approval. Subsection 5.4 of the Licensing Agreement grants EW "a freely revocable, non-transferable, non-assignable, non-exclusive limited right to use CCWE's or CCWE's [sic] trademarks ("Marks") for advertising the CCWE and CCWE [sic] name and brand consistent with CCWE's branding guidelines." It further states that EW "agrees that it has no rights in the

CCWE Marks except as expressly authorized in this Agreement" and that "[a]ll uses of the CCWE Marks must be pre-approved by CCWE."

{¶ 41} Subsection 25, "Use of Name," provides:

> Except as stated in this Agreement, [EW] shall not use the name, logo, likeness, trademarks, image, or other intellectual property of CCWE for any advertising, marketing, press release, case study, endorsement, *or any other purposes without the specific prior written consent of CCWE's Corporate Communications Executive Director as to each such use.*

(Emphasis added.)

{¶ 42} It is clear from the complaint and the Licensing Agreement that Roizen did not have approval to grant a sublicense to Aeroscena to brand itself as CCWE-approved. Accordingly, EW could not have justifiably relied on Roizen's alleged approval for the sublicense or sharing a booth at the trade show.

{¶ 43} Further, EW alleges that Roizen and Gubanc, a Senior Director of CCWE, initially approached EW together about EW potentially sublicensing Aeroscena, but that EW declined because it was "further advised that CCWE would deal with Aeroscena's licensing separately." Afterwards, Roizen approached EW and advised that "CCWE had determined the Aeroscena aromatic oils would, in fact, be sublicensed through EW after all." As discussed, Gubanc — not Roizen — was the only one designated with the authority to sign and in fact signed the Licensing Agreement on behalf of CCWE; it is undisputed that Roizen is not party to the Licensing Agreement; and, discussed below, EW has not alleged sufficient facts to support that CCWE held Roizen out to have actual or apparent authority to

approve a sublicense. Further, EW has not alleged sufficient facts to demonstrate that it obtained the requisite approval to grant the sublicense pursuant to the Licensing Agreement. Accordingly, any reliance EW placed on Roizen having authority to approve the Aeroscena sublicense was not justified.

### 3. Deceptive Trade Practices against Roizen

{¶ 44} In Count 3, EW purports to allege a violation of the Deceptive Trade Practices Act ("Ohio DTPA"), codified at R.C. 4165.01 et seq. EW alleges that Roizen violated R.C. 4165.02(A)(7) by falsely representing to EW that: (1) EW's pillows had CCWE-approval for marketing and sale under the Licensing Agreement and (2) Roizen had all necessary permission from CCWE to extend marketing support to Aeroscena.

{¶ 45} The Ohio DTPA provides:

> A person engages in deceptive trade practice when, in the course of the person's business, vocation, or occupation, * * * the person represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have.

R.C. 4165.02(A)(7).

{¶ 46} "The Ohio Deceptive Trade Practices Act is substantially similar to the federal Lanham Act, and it generally regulates trademarks, unfair competition, and false advertising." *Dawson v. Blockbuster, Inc.*, 8th Dist. Cuyahoga No. 86451, 2006-Ohio-1240, ¶ 23, citing *Yocono's Restaurant, Inc. v. Yocono*, 100 Ohio App.3d 11, 17, 651 N.E.2d 1347 (1994). "When adjudicating claims under the Ohio Deceptive Trade Practices Act, Ohio courts shall apply the same analysis

applicable to claims commenced under analogous federal law." *Id.* at ¶ 23, quoting *Chandler & Assoc. v. Am.'s Healthcare Alliance,* 125 Ohio App.3d 572, 579, 709 N.E.2d 190 (8th Dist.1997). Thus, Ohio courts look to the analogous federal Lanham Act when analyzing Ohio DTPA claims. *Cesare v. Work*, 36 Ohio App.3d 26, 28, 520 N.E.2d 586 (9th Dist.1987); *Max Rack, Inc. v. Core Health & Fitness, LLC*, S.D.Ohio No. 2:16-cv-01015, 2019 U.S. Dist. LEXIS 158008, 21 (Sept. 17, 2019) (dismissing Ohio DTPA claim under R.C. 4165.02(A)(7) based on Lanham Act analysis). We therefore look to the Lanham Act for guidance regarding EW's Ohio DTPA claim. 15 U.S.C. 1125, et seq.

{¶ 47} The purpose of the Lanham Act, and by comparison the Ohio DTPA, "is exclusively to protect the interests of a purely commercial class against unscrupulous commercial conduct." *Michelson v. Volkswagen Aktiengesellschaft*, 2018-Ohio-1303, 99 N.E.3d 475, ¶ 16 (8th Dist.), citing *Dawson v. Blockbuster, Inc.*, 8th Dist. Cuyahoga No. 86451, 2006-Ohio-1240, ¶ 24. Similarly, the Ohio DTPA requires a false representation be made while the person is engaged in some type of "business, vocation, or occupation." R.C. 4165.02. *See also Gascho v. Global Fitness Holdings, LLC*, 863 F.Supp.2d 677, 698 (S.D. Ohio 2012). The Lanham Act requires a plaintiff to establish five elements:

> (1) the defendant has made false or misleading statements of fact concerning his own product or another's; (2) the statement actually deceives or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce; and (5) there is some

causal link between the challenged statements and harm to the plaintiff.

*Max Rack, Inc.* at 18, citing *Grubbs v. Sheakley Group Inc.*, 807 F.3d 785, 798 (6th Cir.2015).

{¶ 48} "Where an advertisement communicates a 'literally false' message to consumers, courts will presume that the consumers were deceived." *Id.*, quoting *Wysong Corp. v. APN, Inc.*, 889 F.3d 267, 270-71 (6th Cir. 2018). *Max Rack* at 18.

{¶ 49} Further, "[p]laintiffs seeking damages for false advertising must 'present evidence that a "significant portion" of the consumer population was deceived.'" *Grubbs* at 802, quoting *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 323 (6th Cir. 2001), quoting *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 616 (6th Cir.1999).

{¶ 50} We find that even if Roizen's alleged statements were false, EW has not stated a claim for relief under the Ohio DTPA.

### a)  Misrepresentation regarding the pillows

{¶ 51} EW alleges that Roizen falsely stated that CCWE had approved the pillows. As a result, EW displayed the pillows in a CCWE-branded booth at a trade show with Aeroscena oils; CCWE terminated the Licensing Agreement; and EW lost sales and development costs. We find that EW's claim fails under the Lanham Act analysis.

{¶ 52} At the motion to dismiss stage, we accept the plaintiff's allegations as true. *Byrd v. Faber*, 57 Ohio St.3d 56, 60, 565 N.E.2d 584 (1991) ("Under Ohio

law, when a party files a motion to dismiss for failure to state a claim, all factual allegations of the complaint must be taken as true and all reasonable inferences must be drawn in favor of the nonmoving party."). For purposes of our review, we therefore accept as true that Roizen's statement about the pillows was false. Even accepting that the statement was false, EW cannot show under these facts that Roizen's statement caused or tended to cause EW to be deceived. EW cannot show it was actually deceived by Roizen's statement where Roizen did not have authority under the governing Licensing Agreement to approve the pillows. Also, we find any connection between Roizen's statement and interstate commerce too tenuous to sustain a claim under these facts. To the extent the pillows were falsely advertised to consumers at the trade show, such advertisement was not the result of Roizen's statement to EW, but EW's decision to display the pillows at the trade show without getting CCWE's approval pursuant to the Licensing Agreement.

### b) Misrepresentation regarding Roizen's authority to approve the Aeroscena sublicense

{¶ 53} EW's allegation that Roizen falsely represented he had the necessary permission from CCWE to extend marketing support to Aeroscena fails because the statement was not disseminated to any consumers, let alone a significant portion of consumers. *Grubbs*, 807 F.3d at 802. Further, there is no indication that the consumer population was deceived by Roizen's statement regarding his authority to approve the sublicense. *Id.* Thus, EW cannot sustain a claim under the Ohio DTPA based on that statement.

**{¶ 54}** Accordingly, we find that EW has failed to state a claim under the Ohio DTPA and affirm the trial court's dismissal of Count 3.

### B.     EW's Claims Against CCWE

### 1.     Breach of Contract Against CCWE

**{¶ 55}** In its breach of contract claim, EW alleges that CCWE breached the Licensing Agreement and the implied duty of good faith when it terminated the agreement after the trade show.  EW also alleges that CCWE, through Roizen's actions, breached the Licensing Agreement by violating subsection 3.17, which prohibits CCWE from employing "deceptive, misleading or unethical practices related to the advertising, marketing sales or licensing of the Product."

**{¶ 56}** We find that EW can prove no set of facts entitled it to recover and affirm the trial court's decision to dismiss EW's breach of contract claim against CCWE.

### a)     The Licensing Agreement is Valid and Enforceable

**{¶ 57}** CCWE argues that EW's breach of contract claim fails because CCWE did not breach the contract and, even if it did, EW has not alleged that it can recover damages under the contract.  The threshold issue at the heart of these arguments is whether the termination and limitation of liability clauses in the Licensing Agreement are valid and enforceable.  We find that they are.

**{¶ 58}** "[C]ontracts entered into freely and fairly are enforceable."  *Alotech Ltd. L.L.C. v. Barnes*, 8th Dist. Cuyahoga No. 104389, 2017-Ohio-5569, ¶ 14, citing *Cincinnati City School Dist. Bd. of Edn. v. Conners*, 132 Ohio St. 3d 468, 2012-

Ohio-2447, 974 N.E.2d 78, ¶ 15. "Further, '[t]he freedom to contract is a deep-seated right that is given deference by the courts.'" *Id.* However, the right is not absolute and "[a] court may refuse to enforce a contract when it violates public policy." *Id.* at ¶ 15, quoting *DeVito v. Autos Direct Online, Inc.*, 2015-Ohio-3336, 37 N.E.3d 194, ¶ 37 (8th Dist.).

{¶ 59} As the Supreme Court has explained:

"'Public policy' is the community common sense and common conscience extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like.' 'Again, public policy is that principle of law which holds that no one can lawfully do that which has a tendency to be injurious to the public or against the public good.'"

*Id.*, quoting *Conners* at ¶ 17, quoting *Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Kinney*, 95 Ohio St. 64, 64, 115 N.E. 505 (1916); *Eagle v. Fred Martin Motor Co.*, 157 Ohio App.3d 150, 2004-Ohio-829, 809 N.E.2d 1161, ¶ 64 (9th Dist.); Ohio Jurisprudence 3d, Contracts, Section 94, at 528 (1980).

{¶ 60} Accordingly, "contracts which bring about results which the law seeks to prevent are unenforceable as against public policy." *Alotech* at ¶ 15, quoting *Conners* at ¶ 17. The legislative branch is the arbiter of public policy, but it is the courts who must determine when the public-policy exception to freedom of contract should be recognized. *Id.* at ¶ 16, citing *Conners* at ¶ 17. We, therefore, must determine whether enforcing the terms of the Licensing Agreement "accomplishes a result that the state has sought to prevent or whether it accomplishes something that the state seeks to facilitate." *Id.*

{¶ 61} EW argues that the termination and limitation of liability clauses violate public policy and that EW can therefore sustain a breach of contract claim by alleging that CCWE terminated the agreement in bad faith.  We disagree.  Although the contract overall is extremely favorable to CCWE, it is not against public policy.  CCWE and Balance Product Development, Inc. freely entered into the Licensing Agreement.  EW was competent enough to read and understand the terms of the Licensing Agreement and accepted the assignment without negotiating any new terms.  Thus, we find that the termination clause and limitation of liability clause are not against public policy and are, therefore, enforceable under freedom of contract principles.

i. The Termination Clause is Enforceable

{¶ 62} Section 12 of the Licensing Agreement is titled "Term and Termination."  It states, in pertinent part:

> Either party may terminate this Agreement for its convenience at any time upon one hundred twenty days written notice to the other party. Upon termination of this Agreement for any reason, Company agrees to cease all use of the CCWE Marks within thirty (30) days after such termination and shall cease offering Programs to third parties.

{¶ 63} The parties were free to include a mutual provision allowing for termination at the convenience of the party exercising the right.  EW did not renegotiate the termination clause when it accepted the assignment of the Licensing Agreement.  As a matter of law, the provision does not violate public policy and is therefore valid and enforceable.  CCWE plainly had the right to terminate the Licensing Agreement at its convenience, as did EW.

## ii. Limitation of Liability Clause is Enforceable

**{¶ 64}** EW argues that limitation of liability clauses are not enforceable under Ohio law if they excuse willful, wanton, or reckless behavior, or offend public policy. We find that the limitation of liability clause does not offend public policy.

**{¶ 65}** Section 10 of the Licensing Agreement is titled "Limitation of Liability." It states, in all capital letters:

> Other than company's indemnification obligation under this agreement, neither party shall have any liability in regard to consequential, exemplary, special, incidental or punitive damages, even if it has been advised of the possibility of such damages. Except for company's indemnification obligation under this agreement, *in no event shall either party's total liabiltiy in connection with or under this agreement* (whether under the theories of breach of contract, tort, negligence, strict liability, or any other theory of law) *exceed the fees payable to CCWE for the license and sale of products during the first 12 months of this agreement.*

(Emphasis added.)

**{¶ 66}** EW relies on *Berjian v. Ohio Bell Tel. Co.*, 54 Ohio St.2d 147, 375 N.E.2d 410 (1978), and *Purizer Corp. v. Battelle Mem. Inst.*, 2002 U.S. Dist. LEXIS 138 (N.D. Ill. 2002), to argue that the limitation of liability clause violates public policy and is therefore unenforceable, but neither case is applicable here.

**{¶ 67}** *Berjian* determined that a limitation clause by which a public utility was exempt from damages resulting from its own negligence was valid and enforceable where the utility did not have a legal or public duty to provide a specific service to its customers and it did not violate any other public policy. The court further held that, absent a showing of a duty owed by the defendant and

willful or wanton misconduct by the defendant, the limitation clause was enforceable. *Berjian* at 158. Unlike *Berjian*, the limitation clause does not exempt CCWE from its own negligence; it merely sets a limit on damages recoverable by either party. Further, the instant case does not involve any public or legal duty that would render the limitation of liability clause unenforceable under *Berjian*.

{¶ 68} *Purizer* similarly held that a limitation of liability clause was ineffective because the plaintiff's fraud claim contained an allegation of willful and reckless misconduct. *Purizer* at 14. However, the limitation clause in *Purizer*, as in *Berjian*, completely excused the defendant from any liability for damages in connection with the agreement. Here, the limitation clause does not excuse CCWE or EW from willful, wanton, or reckless behavior or offend public policy. It merely limits the damages either party can recover. EW's allegations regarding willful and wanton misconduct are conclusory and without factual support. We therefore find the limitation of liability clause in the Licensing Agreement to be valid and enforceable.

{¶ 69} Having determined that the Licensing Agreement is valid and enforceable, we next consider whether EW has stated a claim for breach of contract upon which it can obtain relief.

### b) Breach

{¶ 70} "A cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the

breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.3d 458, ¶ 41.

{¶ 71} EW argues that to survive a motion to dismiss, it need not plead a claim for breach of contract with specificity. Nonetheless, we must dismiss a claim if, as here, it "'appear[s] beyond doubt from the complaint that the plaintiff can prove no set of facts entitling [it] to recover.'" *Cord v. Victory Solutions, LLC*, 8th Dist. Cuyahoga No. 106006, 2018-Ohio-590, ¶ 11, quoting *Chinese Merchants Assn. v. Chin*, 159 Ohio App.3d 292, 2004-Ohio-6424, 823 N.E.2d 900, ¶ 4 (8th Dist.).

{¶ 72} EW has alleged that CCWE breached by wrongfully terminating the Licensing Agreement and by violating subsubsection 3.17, which prohibits unethical conduct related to the licensing or marketing of the product, through Roizen's actions. CCWE argues that EW's breach of contract claim fails on its face because the contract allowed either party to terminate "for its convenience at any time" and claims it did not breach subsection 3.17.

{¶ 73} EW argues the following in response: (1) CCWE lost the right to terminate for convenience because Roizen caused a breach of the contract by violating subsection 3.17 of the Licensing Agreement; (2) CCWE is improperly relying on the termination and limitation of liability clauses as affirmative defenses that cannot be proved based on the pleadings and may not be considered on a motion to dismiss unless the allegations in the complaint "leave no doubt that the asserted avoidance is unavoidable"; and (3) CCWE's bad faith prohibits it from

relying on the termination clause to avoid a breach of contract claim.  We address each of these arguments in turn.

i. Subsection 3.17

{¶ 74} First, the complaint and Licensing Agreement demonstrate that EW cannot prove Roizen or CCWE breached subsection 3.17 of the Licensing Agreement.  That section states as follows, in pertinent part:

> Each party agrees that it will not employ in any manner any deceptive, misleading or unethical practices related to the advertising, marketing, sales or licensing of the Product(s).

{¶ 75} One of the "whereas" clauses of the Licensing Agreements provides that:

> CCWE desires to enter into an arrangement with [EW] for the production and sale of Products, defined collectively and individually as "electric and non-electric consumer durable/hard goods along with any directly- related consumable components (e.g. razor and razor blades) and directly-related software/mobile apps (e.g. Nest thermostat and related mobile app and website), which must also further the charitable mission of CCF[.]

{¶ 76} Thus, the definition of "Product" in the Licensing Agreement contemplates that CCWE and EW were contracting for the production and sale of any number of products.  Roizen's alleged violation of subsection 3.17 related to Aeroscena's essential oils, not to any product produced by EW.  Roizen's alleged request for a sublicense for his company, Aeroscena, under false pretense or without authority, is not a deceptive, misleading or unethical practice related to the advertising, marketing, sales, or licensing of a product as defined in the Licensing Agreement.  Further, EW also alleges that it obtained all the necessary approvals to

license its pillows.  Roizen's alleged statement that EW had the necessary approval for the licensing could not have been a deceptive, misleading, or unethical practice if the statement was true, as EW alleged.  We conclude, based on the complaint and contract, that Roizen did not breach subsection 3.17.

{¶ 77} The allegation that CCWE violated subsection 3.17 before terminating the Licensing Agreement is based exclusively on Roizen's alleged actions.  However, discussed more thoroughly below, the complaint fails to allege any factual support for its allegation that Roizen had actual or apparent authority to act on CCWE's behalf.  Thus, according to the complaint and terms of the contract, EW cannot prove CCWE breached subsection 3.17.

## ii. First Material Breach

{¶ 78} EW next argues that CCWE did not have the right to terminate the Licensing Agreement at its convenience because it alleged Roizen or CCWE breached subsection 3.17 before CCWE terminated the agreement.  This argument fails because, having considered the complaint and contract, Roizen did not breach subsection 3.17.

{¶ 79} EW's argument misconstrues the principle of a first material breach. EW asserts that because it alleged Roizen breached subsection 3.17 before CCWE terminated the agreement, Roizen's breach precluded CCWE from exercising its right to terminate for convenience.  EW's theory misses the mark. Even if Roizen or CCWE breached subsection 3.17 and the breach was material, such a first material breach might excuse EW from further performance, but would not

prohibit CCWE from exercising its contractual termination rights. *Lease Auto Corp. Div. of Milt Miller Pontiac v. Starr*, 8th Dist. Cuyahoga No. 35460, 1977 Ohio App. LEXIS 7491, 12 (Feb. 24, 1977) (holding that a first material breach can excuse the non-breaching party from further performance).

### iii. Termination and Limitation of Liability Clauses as Avoidable Defenses

{¶ 80} EW next argues that the termination and limitation of liability clauses are avoidances that may only be used as the basis for dismissal under Civ.R. 12(B)(6) if the allegations of the complaint leave no doubt that the asserted avoidance is unavoidable. EW is correct on this point of law. *See Pierce v. Woyma*, 8th Dist. Cuyahoga No. 94037, 2010-Ohio-5590, ¶ 38 ("An affirmative defense, such as statutory immunity, may be asserted through a motion to dismiss so long as the basis for the defense is apparent from the face of the complaint."). However, we find that we may properly consider these provisions of the Licensing Agreement at the motion to dismiss stage and that both provisions present unavoidable defenses that require EW's breach of contract claim against CCWE be dismissed.

{¶ 81} When a contract is attached to a complaint, Civ.R. 10(C) applies, which states in part, "A copy of any written instrument attached to a pleading is a part of the pleading for all purposes." Thus, to determine whether the allegations in a complaint are legally sufficient to state a claim, we look both to the complaint and "the copy of a written instrument upon which a claim is predicated[.]" *Fairview Realty Investors v. Seaair, Inc.*, 8th Dist. Cuyahoga No. 81296, 2002-

Ohio-6819, ¶ 8. We should grant a motion to dismiss if the writing attached to the complaint is "clear and unambiguous" and "'presents an insuperable bar to relief.'" *Id.*, quoting *Slife v. Kundtz Properties, Inc.*, 40 Ohio App.2d 179, 184, 318 N.E.2d 557 (8th Dist.1974). Although we consider the facts in the light most favorable to EW, we "need not presume the truth of 'unsupported conclusions.'" *Abdallah v. Doctor's Assocs.*, 8th Dist. Cuyahoga No. 89157, 2007-Ohio-6065, ¶ 2, quoting *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 193, 532 N.E.2d 753 (1988).

{¶ 82} The Licensing Agreement was attached to the complaint and therefore is considered part of the pleading. Having found that the termination and limitation of liability provisions therein are valid and enforceable provisions, they are properly considered on a motion to dismiss. We next discuss our finding that the termination and limitation of liability clauses are unambiguous and present insuperable bars to relief.

{¶ 83} There is nothing in the complaint or the Licensing Agreement to suggest that CCWE did not have the right to terminate the agreement at the time and in the manner alleged. Section 12 of the Licensing Agreement provides that CCWE could terminate the Agreement at any time for any reason: "Either party may terminate this Agreement for its convenience at any time upon one hundred twenty days written notice to the other party." The language of the clause is clear and unambiguous. Thus, even though EW alleges that CCWE breached the Licensing Agreement by terminating it in bad faith to shield Roizen, such an

allegation would fail to establish a breach under Section 12 of the Licensing Agreement because CCWE was permitted to terminate "for its convenience."

{¶ 84} Moving to the limitation of liability provision, Section 10 of the Licensing Agreement limits EW's recovery under the Licensing Agreement to the "fees payable to CCWE for the license and sale of products during the first 12 months of this agreement." The Licensing Agreement provides that its effective date was June 17, 2015. Thus, based on the clear and unambiguous terms of the Licensing Agreement, EW's recovery under the Licensing Agreement is limited to the fees payable to CCWE for the license and sale of products between June 17, 2015, to June 17, 2016. Although EW's complaint alleges that CCWE's "bad faith and material breaches" caused EW to suffer damages in excess of $25,000, it also alleges that the test-marketing launch on QVC for the pillows was June 21, 2017. Because June 21, 2017, is more than 12 months after June 17, 2015, the facts as alleged do not establish the damages element of a breach of contract. The limitation of liability provision therefore also presents an insuperable bar to relief.

{¶ 85} Because the termination and limitation of liability clauses both present insuperable bars to relief, they are properly considered on a motion to dismiss. *See Keenan v. Adecco Emp. Servs.*, 3d Dist. Allen No. 1-06-10, 2006-Ohio-3633, ¶ 16 (affirming the trial court's dismissal of the plaintiff's claim pursuant to Civ.R. 12(B)(6) where the claim asserted in the complaint contradicted the contract underlying the claim); *Beard v. N.Y. Life Ins. & Annuity Corp.*, 10th Dist. Franklin No. 12AP-977, 2013-Ohio-3700, ¶ 28 (affirming trial court's

dismissal of complaint because the claim expressly contradicted the terms of the writing attached to the complaint).

### iv. Bad Faith

{¶ 86} EW also argues that CCWE did not have the right to exercise its termination rights because it did so in bad faith. EW alleges that CCWE terminated the Licensing Agreement two days after the Las Vegas trade show where EW shared a CCWE-branded booth with Aeroscena. Based on the timing of the termination, EW claims CCWE terminated the Licensing Agreement "to shield Roizen from the consequences of his misconduct, and to thrust the burden of Roizen's misconduct onto EW." EW contends that it sufficiently pled a breach of the implied duty of good faith and fair dealing because it alleged that CCWE had ulterior motives for terminating the Licensing Agreement.

{¶ 87} The "the implied duty of good faith and fair dealing does not mean that parties are forbidden from exercising the rights and duties defined in a contract[.]" *B&H Res., L.L.C. v. 28925 Lorain Inc.*, 8th Dist. Cuyahoga No. 105323, 2017-Ohio-7248, ¶ 12. Accordingly, we do not find that EW's allegation that CCWE terminated the contract in bad faith saves its claim for breach of contract. *See Duer v. Bd. of Edn.,* 8th Dist. Cuyahoga No. 45245, 1983 Ohio App. LEXIS 14762, 4 (Mar. 24, 1983) (even if the superintendent acted in bad faith, the teacher failed to state a claim for breach of contract because the superintendent had "complete discretion in the assignment of teachers"); *Ed Schory & Sons v. Francis*, 75 Ohio St.3d 433, 443, 662 N.E.2d 1074 (1996), quoting *Kham & Nate's*

*Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1357, 1990 U.S. App. LEXIS 12831 (7th Cir.1990) (bank's decision to enforce parties' agreements as written was not an act of bad faith; "'[a]lthough courts often refer to the obligation of good faith that exists in every contractual relation, * * * this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document'").

{¶ 88} In support of its argument, EW relies on two cases that, apart from not being binding authority, are distinguishable from the instant case: *Florence Urgent Care v. HealthSpan, Inc.*, 445 F.Supp.2d 871 (S.D.Ohio 2006), and *Littlejohn v. Parrish*, 163 Ohio App.3d 456, 2005-Ohio-4850, 839 N.E.2d 49 (1st Dist.).

{¶ 89} *Florence* held that the employer-defendant was not entitled to summary judgment on a breach of contract claim where it terminated employees under a "without cause" clause. *Florence* at 879-880. The court reasoned that a jury might find the employer breached the implied duty of good faith and fair dealing because the employer admittedly gave false reasons for the termination and therefore, the termination might have violated public policy and constituted a breach of good faith. *Id. Florence*, however, involved allegations of discrimination related to the termination, which, unlike CCWE's alleged actions, would violate public policy.

{¶ 90} *Littlejohn* denied summary judgment in a mortgagee's lawsuit alleging the mortgagor unreasonably withheld consent to prepay a mortgage note

where the note required the mortgagor's approval to do so. The court held that the implied duty of good faith applied to the contract and that summary judgment was not appropriate because whether the mortgagor's denial was reasonable was a fact issue. *Littlejohn* at ¶ 31. It further reasoned that if the denial was unreasonable, such denial could amount to a restraint on the alienation of property. *Id.*

{¶ 91} EW argues that *Florence* and *Littlejohn* support its argument that CCWE breached the implied duty of good faith because it alleged an ulterior motive for terminating the Licensing Agreement. But unlike here, *Florence* and *Littlejohn* did not merely involve ulterior motives. Rather, both involved potential violations of public policy underlying the contract termination. As discussed, we do not believe the termination clause violates public policy and none of EW's allegations or arguments demonstrate that CCWE violated public policy in terminating the agreement. We decline to hold that CCWE's motive in terminating could result in a breach of bad faith where CCWE acted under a broad termination clause; such a holding would encroach upon the well-settled doctrine of freedom of contract.

{¶ 92} EW's position seems to be that CCWE was not free to terminate the contract for convenience because bad faith motivated the termination. That proposition, however, would result in a construction of the termination clause that is contrary to its plain meaning. It seems that EW would have us modify the plain wording of the termination clause to require that termination be restricted to instances supported by a showing of good cause. There is no reason to inquire into

CCWE's motive to terminate the contract because the parties agreed to a mutual termination clause that, as we determined, does not violate public policy and is therefore valid and enforceable. Thus, the issue of good faith regarding CCWE's termination is immaterial because the Licensing Agreement, a valid and enforceable contract, allows for termination for either party's convenience.

{¶ 93} Moreover, even if CCWE breached the contract, EW's claim fails for lack of damages. On the face of the complaint, EW did not suffer any damages that fall within the liability limitation clause of the Licensing Agreement.

### c)      Contract Damages

{¶ 94} As discussed, the Licensing Agreement limits EW's damages against CCWE to "the fees payable to CCWE for the license and sale of products during the first 12 months of this agreement." The Licensing Agreement was signed on June 17, 2015. Thus, CCWE's damages are limited to "the fees payable to CCWE for the license and sale of products" from June 17, 2015, to June 17, 2016.

{¶ 95} Pursuant to the Royalty Schedule set forth in Exhibit C of the Licensing Agreement, the fees payable to CCWE are a royalty based on the "gross sales price of the Product that are collected and paid to [EW] from the sale of Licensed Products less any trade or quantity discounts, warehouse allowances, and sales tax and other authorized taxes (if any) and CCWE approved returns."

{¶ 96} The complaint alleges that EW "incurred significant expense in manufacturing, marketing, obtaining necessary approvals for, and making ready to sell" the pillows between 2015 and 2016, including the QVC launch scheduled for

June 21, 2017. It does not allege that any fees payable to CCWE were incurred before June 17, 2016. On the face of the complaint and contract, EW is precluded from recovering from CCWE anything other than the royalties owed to CCWE for pillow sales between June 17, 2015 and June 17, 2016. According to the complaint, there were no sales until long after that time in June 2017.

{¶ 97} EW further alleges that "CCWE specifically advised Enduring Wellness that it had included royalty estimates for the 4th quarter of 2016 and 2017 for Enduring Wellness's approval branded pillow sales in its budget." The fourth quarter of 2016 would have started around October 1, 2016 — more than three months after the twelve-month liability limitation period set forth in the Licensing Agreement had ended. In addition, even presuming that EW sold pillows at the trade show in Las Vegas in March 2017, those sales are also beyond the contractual limitation period.

{¶ 98} Accordingly, presuming all factual allegations of the complaint as true and making all reasonable inferences in favor of the moving party, there is no set of facts consistent with EW's complaint, which would allow EW to recover damages from CCWE. Accordingly, we affirm the trial court's dismissal of Count 4 of the complaint.

### 2. Apparent Authority/Agency by Estoppel against CCWE

{¶ 99} In its apparent authority/agency by estoppel claim, EW alleges that Roizen acted with actual or apparent authority of CCWE by "administering the Licensing Agreement and latching onto Enduring Wellness's marketing efforts on

behalf of Aeroscena." It alleged, in conclusory fashion, that CCWE held out Roizen as having such authority and that EW in good faith believed Roizen possessed such authority. EW further alleged that Roizen's conduct damaged EW. EW alternatively requested that CCWE be estopped from terminating the Licensing Agreement given its actions in holding out Roizen to have had the authority to act as he did.

{¶ 100} "In order to establish apparent agency, the evidence must show that the principal held the agent out to the public as possessing sufficient authority to act on his behalf and that the person dealing with the agent knew these facts, and acting in good faith had reason to believe that the agent possessed the necessary authority." *Ohio State Bar Assn. v. Martin*, 118 Ohio St.3d 119, 2008-Ohio-1809, 886 N.E.2d 827, ¶ 41, quoting *Master Consol. Corp. v. BancOhio Natl. Bank*, 61 Ohio St.3d 570, 575 N.E.2d 817 (1991), syllabus. "Under an apparent-authority analysis, an agent's authority is determined by the acts of the principal rather than by the acts of the agent. The principal is responsible for the agent's acts only when the principal has clothed the agent with apparent authority and not when the agent's own conduct has created the apparent authority." *Id.*, quoting *Master Consol.* at 576-577. "The assurances of one who assumes to act as an agent of his authority to bind another are not, standing alone, sufficient to prove his agency. The putative agent cannot create apparent agency alone." *Koos v. Storms*, 8th Dist. Cuyahoga No. 84260, 2004-Ohio-6020, ¶ 38, quoting *Info. Leasing*

*Corp. v. Chambers*, 152 Ohio App.3d 715, 740, 2003-Ohio-2670, 789 N.E.2d 1155 (1st Dist.).

{¶ 101} Beyond Roizen's status as Chief Wellness Officer and assertions of his own authority, the complaint fails to state any facts to support EW's conclusory allegation that CCWE clothed Roizen with apparent authority. The Licensing Agreement itself does not give actual authority to Roizen for any of his alleged acts. Rather, the Licensing Agreement specifically required written approval from CCWE and does not mention Roizen or reference his title of Chief Wellness Officer. Further, the complaint tells us that EW was initially advised that CCWE would not approve a sublicense of Aeroscena through EW. A year later, Roizen advised that CCWE had changed its mind and that it would allow EW to sublicense Aeroscena. In light of the Licensing Agreement and CCWE's initial refusal to grant the sublicense, EW cannot prove that, acting in good faith, it had reason to believe that Roizen had actual or apparent authority from CCWE to approve EW's pillows or the Aeroscena sublicense. Thus, EW cannot prove that CCWE is responsible for any of Roizen's allegedly improper acts.

{¶ 102} We further note that because EW failed to state a claim against Roizen in his personal capacity, there is no liability for CCWE to assume. *See Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 20 ("If there is no liability assigned to the agent, it logically follows that there can be no liability imposed upon the principal for the agent's actions.").

{¶ 103} We affirm the trial court's dismissal of EW's Count 5.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

MARY J. BOYLE, P.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR